NANCY FLAKE, BY HER NEXT FRIEND, MRS. W. F. FLAKE, v. THE GREENSBORO NEWS COMPANY, NORTH CAROLINA THEATRES, INC., L. MELTS, TRADING AND DOING BUSINESS UNDER THE STYLE AND FIRM NAME OF "MELTS BAKERY," ANTON SCIBILIA AND NICK BOILA, TRADING AND DOING BUSINESS UNDER THE STYLE AND FIRM NAME OF "FOLIES DE PAREE."

(Filed 2 February, 1938.)

1. **Libel and Slander § 1—Classes of libel defined.**

   The three classes of libel are (1) publications obviously defamatory which are termed libels *per se*, (2) publications susceptible of two interpretations, one defamatory and the other not, and (3) publications not obviously defamatory, but which become so when considered in connection with innuendo, colloquium and explanatory circumstances, which are termed libels *per quod*.

2. **Libel and Slander § 2—**

   When an unauthorized publication is libelous *per se*, malice and damage are presumed as a matter of law, even though no actual pecuniary loss is in fact suffered, and no proof of injury is required.

3. **Libel and Slander § 4—**

   When an unauthorized publication is susceptible of two interpretations, one libelous and the other not, it is for the jury to determine under the circumstances whether the publication is defamatory and was so understood by those who saw it.

4. **Libel and Slander § 3—**

   In publications which are libelous *per quod*, the innuendo and special damages must be alleged and proved.

5. **Libel and Slander § 2—**

   Caricatures or other signs written or printed, as well as written words, may be libelous and actionable *per se*.

6. Same—Matter is libelous per se if, standing alone, it tends to expose plaintiff to hatred, contempt, ridicule, or aversion.

An unauthorized publication is libelous *per se* when, standing alone and stripped of any innuendo, it is susceptible of but one meaning, which would tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned or avoided, and it is not necessary that the words charge the commission of a crime or the violation of law, or impute moral turpitude or immoral conduct.

7. Same—

In determining whether a publication is libelous *per se*, the courts will consider the publication in the sense in which it would be naturally understood by ordinary men, and not as it might be understood by those of morbid imaginations or supersensitiveness.

8. Same—

An unauthorized publication is libelous *per se* if it charges a person with having committed an infamous crime, or with having an infectious disease, or tends to subject him to ridicule, contempt or disgrace, or tends to injure him in his trade or profession.

9. Libel and Slander § 5—

The publication of a libelous picture of plaintiff is sufficient to support a cause of action, and it is immaterial that the printed words tend to identify the picture as that of another person.

10. Libel and Slander § 2—Publication of picture of plaintiff as disclosed by evidence held not to constitute libel per se.

The evidence disclosed that by mistake the picture of plaintiff dressed in a bathing suit was published in a newspaper advertisement instead of the intended picture of a member of a vaudeville troupe, that the accompanying printing indicated that the person in the picture was a member of the troupe which was to stage a performance in the city, and that she recommended the bread manufactured by one of defendants for the preservation of a slim figure and for energy, and described her under the name of a member of the troupe as an "exotic red-haired Venus." *Held:* The publication is not libelous *per se*, since neither the representation that plaintiff recommended a legitimate article of merchandise constituting an item of daily food, nor that she was a member of a troupe engaged in a legitimate and well recognized type of professional entertainment, tends to disgrace and degrade plaintiff, or to hold her up to public hatred, contempt, ridicule or aversion, it not being alleged or contended that there was any libel through distortion of the photograph.

11. Damages § 1—

The law seeks to compensate for damage to the person, reputation or property, and mere hurt and embarrassment are not subjects of compensatory damages.

12. Libel and Slander §§ 3, 13—When plaintiff offers no evidence of special damage, she may not recover for libel per quod.

When the publication complained of is not libelous *per se* and plaintiff does not allege or prove special damage or that a libelous construction was placed on the publication by those who saw it, defendants' motions to nonsuit should be granted, and it is unnecessary to consider whether

the publication was libelous *per quod* upon plaintiff's allegation and evidence tending to establish that the publication was libelous when considered in connection with other facts and circumstances.

**13. Civil Rights § 1—**

In a strict sense, there are no property rights, but only individual civil rights and individual rights relating to property.

**14. Civil Rights § 2—**

The constitutional right of free speech and of a free press is involved in determining to what extent a newspaper may publish the picture of an individual.

**15. Same—Plaintiff held entitled to nominal damages upon showing that her photograph was used in advertisement without authorization.**

The unauthorized use of a photograph in a newspaper advertisement or other commercial enterprise gives rise to a right of action entitling plaintiff to nominal damages at least, and to injunctive relief when the wrong is persisted in, but where the evidence establishes such unauthorized use of plaintiff's photograph by mistake and without malice, and that defendants desisted and apologized upon learning of the mistake, without evidence of special damage, plaintiff is entitled to nominal damages only.

APPEAL by defendants from *Hill, Special Judge,* at 12 April Term, 1937, of FORSYTH.

This is a civil action to recover damages which the plaintiff alleges she sustained as the result of the publication of her photograph or likeness in connection with an advertisement in the *Greensboro Daily News,* published by the defendant Greensboro News Company.

No summons was served on the defendants Anton Scibilia and Nick Boila, trading under the firm name of "Folies de Paree," and they are not parties hereto. Folies de Paree was a vaudeville or stage show and advertised its performance through a system of "tie up" advertising. Under this system some merchant and the local theatre joined in the advertisement and it advertises both the product or the merchandise of the merchant and the theatre performance. Pursuant to this plan, the agent of the "Folies de Paree" solicited the defendant L. Melts, who conducted a bakery in Greensboro under the name of "Melts Bakery," and the defendant North Carolina Theatres, Inc., to join in such an advertisement and as a result a two-column advertisement was published in the *Greensboro Daily News,* issue of 11 March, 1936. In the right portion of the advertisement there was a cut from the plaintiff's photograph showing her standing and wearing a bathing suit. To the left was the following wording, so arranged as to make four distinct statements, as follows:

"Keep that SYLPH-LIKE FIGURE by eating more of Melts' Rye and Whole Wheat Bread, says Mlle. Sally Payne, exotic red-haired Venus—

" 'Folies de Paree' sparkling Parisian Revue, Stage Production, NATIONAL THEATRE two days only, March 11 and 12.

" 'Melts' Rye and Whole Wheat Bread will give you the necessary energy, pep and vitality without adding extra weight,' says Miss Payne. Melts Bakery, 314 N. Elm St., 1829 Spring Garden St.

" 'Ask for Melts' Bread—Melts in Your Mouth.' "

In publishing this advertisement the photograph or mat made therefrom was used without the consent of the plaintiff and was used by mistake—the defendants intending to use a cut of Sally Payne, the leading lady of Folies de Paree.

The mistake having been called to the attention of the defendant Greensboro News Company, it immediately published a full explanation of the mistake and an apology.

The plaintiff does not contend that her likeness was in anywise caricatured or distorted, but alleges that its use as a part of said advertisement tended to connect her with and represent that she was a member of Folies de Paree, which was a "theatrical troupe organized in the city of Chicago and composed of the cheapest class of chorus girls, who receive a salary, as the plaintiff is informed, believes and alleges, of less than $20.00 per week; that said show is a low type of vaudeville entertainment, the girls appearing in same being selected without regard to any qualifications, except appearance; that the girls appearing in said show have no special talent, training nor experience; that said show was a sensual performance, or sex parade."

Plaintiff having, as she contends, shown talent as a radio entertainer, started a course of instructions leading to this career when she was thirteen years of age. She became vocalist for Frank Dailey's Orchestra, program of which, including plaintiff's numbers, was broadcast over the Columbia Broadcasting System, at Station WABC. She had made numerous phonograph records and had recently appeared as a member of an orchestra in Winston-Salem, Sedgefield, Laurinburg, and Durham. She posed for the published photograph and other photographs in the private studios of the Columbia Broadcasting System. She had two pictures made while wearing a bathing suit and the others in conventional dress. These pictures, including those in bathing suit, were used by the Columbia Broadcasting System in giving publicity to her in her performance. She had never been a member of a vaudeville troupe or on the stage except as soloist with her orchestra.

The record does not disclose just how the mistake occurred or how the Greensboro News Company came in possession of the plaintiff's photograph, whether the News Company had the photograph in its files in connection with the plaintiff's campaign for publicity, or it was furnished by Folies de Paree. In this connection the plaintiff testified that mats were made from these photographs (referring to the photographs

taken in the studios of Columbia Broadcasting Company and including two photographs of her while she was dressed in bathing suit), and that "they were sent to very many places and very many people. They were used to give me publicity and were sent out with my entire consent and approval. I was not compelled by anyone to pose for this photograph, but I did try to coöperate. I posed for this photograph of my own free will and accord."

In one of the photographs she is dressed in a bathing suit and is in a standing position. This is the one published by the defendants. In another she is dressed in a bathing suit and is in a recumbent position. She further testified that she never sang while dressed in a bathing suit, but that these photographs were made purely for publicity purposes. At the time of the publication plaintiff was in New York and was unemployed. She first learned of the publication through a letter from her mother.

The bathing suit photograph of plaintiff in recumbent position was published with her entire consent and approval in the magazine "Popular Songs," with the following cut line: "Nifty Nancy Flake, in this fetching attire, proves that singers who have what it takes can be equally alluring flirting with the high seas or the high C's." The photograph was published in other magazines and newspapers with similar cut lines with plaintiff's entire approval.

There was no evidence as to the pay or qualifications of the chorines in the show, but there was evidence that during the show they were as scantily dressed as the plaintiff and that some "dirty" jokes were told.

In the trial below issues were submitted to and answered by the jury as follows:

"1. Did the defendants, or any of them, and if so, which defendant or defendants, wrongfully and unlawfully publish or caused to be published of and concerning the plaintiff the matters set forth in paragraph 8 of plaintiff's complaint, as alleged? A. 'Yes, as to all defendants.'

"2. If so, was such publication, in the light of surrounding facts and circumstances, calculated to bring and did it bring the plaintiff into public ridicule and contempt, as alleged? A. 'Yes.'

"3. What damages, if any, is the plaintiff entitled to recover? A. '$6,500.'"

Judgment was entered in accord with the verdict and the defendants excepted and appealed.

*Slawter & Wall and Parrish & Deal for plaintiff, appellee.*

*Hobgood & Ward, Douglass & Douglass, Kenneth M. Brim, John J. Ingle, Fred S. Hutchins, and Francis I. Anderson for defendants, appellants.*

BARNHILL, J.   While the complaint does not undertake to state two separate and distinct causes of action, it in fact alleges two causes of action and was so interpreted and treated by the court below.   The plaintiff alleges that the publication was libelous and also that it violated plaintiff's alleged right of privacy.

Libels may be divided into three classes: (1) Publications which are obviously defamatory and which are termed libels *per se;* (2) publications which are susceptible of two reasonable interpretations, one of which is defamatory and the other is not, and (3) publications which are not obviously defamatory, but which become so when considered in connection with innuendo, colloquium and explanatory circumstances. This type of libel is termed libel *per quod.*

When an unauthorized publication is libelous *per se,* malice and damage are presumed from the fact of publication and no proof is required as to any resulting injury.   The law presumes that general damages actually, proximately and necessarily result from an unauthorized publication which is libelous *per se* and they are not required to be proved by evidence since they arise by inference of law, and are allowed whenever the immediate tendency of the publication is to impair plaintiff's reputation, although no actual pecuniary loss has in fact resulted.   36 C. J., 1150; *Baker v. Winslow,* 184 N. C., 1; *Fields v. Bynum,* 156 N. C., 413; *New York Evening Post Co. v. Chaloner,* 265 Fed., 204.

In an action upon a publication coming within the second class, that is, a publication which is susceptible of two interpretations, one of which is defamatory, it is for the jury to determine under the circumstances whether the publication is defamatory and was so understood by those who saw it.   *Wright v. Credit Co., ante,* 87; *McCall v. Sustair,* 157 N. C., 179, also at 161 N. C., 213; *Vincent v. Pace,* 178 N. C., 421; *Lewis v. Carr,* 178 N. C., 578; *Lucas v. Nichols,* 52 N. C., 32.

In publications which are libelous *per quod* the innuendo and special damages must be alleged and proved.   *Oates v. Trust Co.,* 205 N. C., 14; *Walker v. Tucker,* 220 Ky., 362; 53 A. L. R., 547; 17 R. C. L., 264; L. R. A., 1916-B, 915.

As the complaint is insufficient to bring the publication under consideration within either the second or the third class—that is, it is not alleged that said publication is susceptible of two meanings, one defamatory, and that the defamatory meaning was intended and was so understood by the public; and there is no allegation or proof of special damages—we must determine whether the publication is defamatory *per se.*   If it is not, the defendants were entitled to judgment of nonsuit as to plaintiff's cause of action upon the publication as a libel.

A libel *per se* is a malicious publication expressed in writing, printing, pictures, caricatures, signs, or other devices, which upon its face and

without aid of extrinsic proof is injurious and defamatory, tending either to blacken the memory of one dead or the reputation of one who is alive and expose him to public hatred, contempt or ridicule. *Simmons v. Morse,* 51 N. C., 6; *Brown v. Lumber Co.,* 167 N. C., 9; Ann. Cases, 1916-E, 631; 36 C. J., 1143. In its most general and comprehensive sense it may be said that any publication that is injurious to the reputation of another is a libel. 36 C. J., 1143.

It may be stated as a general proposition that defamatory matter written or printed, or in the form of caricatures or other signs, may be libelous and actionable *per se,* that is, actionable without any allegations of special damage, if they tend to expose plaintiff to public hatred, contempt, ridicule, aversion or disgrace and to induce an evil opinion of him in the minds of right thinking persons and to deprive him of their friendly intercourse and society. 36 C. J., 1162; *White v. Nichols,* 3 How., 266, 11 L. Ed., 591; *Peterson v. Western Union Telegraph Co.,* 33 L. R. A., 302; *Kelly v. Independent Publishing Co.,* 38 L. R. A., N. S., 1160, Ann. Cas., 1913-D, 1063; *Hall v. Hall,* 179 N. C., 571, 103 S. E., 136; *Simmons v. Morse, supra; Orband v. Kalamazoo Telegraph Co.,* 136 N. W. (Mich.), 380, Ann. Cas., 1914-A, 1124.

In order to be libelous *per se* it is not essential that the words should involve an imputation of crime, or otherwise impute the violation of some law, or moral turpitude, or immoral conduct. *Hedgepeth v. Coleman,* 183 N. C., 309, 111 S. E., 517, 24 A. L. R., 232; *Paul v. Auction Co.,* 181 N. C., 1; *Hall v. Hall, supra; Brown v. Lumber Co., supra,* Ann. Cas., 1916-E, 631; L. R. A., 1915-E, 275. But defamatory words to be libelous *per se* must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided. The imputation must be one tending to affect a party in a society whose standard of opinion the court can recognize. 36 C. J., 1164; *Walsh v. Pulitzer Publishing Co.,* 157 S. W. (Mo.), 326; Ann. Cas., 1914-C, 985; *Crashley v. Press Pub. Co.,* 179 N. Y., 27, 71 N. E., 258.

The general rule is that publications are to be taken in the sense which is most obvious and natural and according to the ideas that they are calculated to convey to those who see them. The principle of common sense requires that courts shall understand them as other people would. The question always is how would ordinary men naturally understand the publication. *Brown v. Lumber Co., supra.* The fact that supersensitive persons with morbid imaginations may be able, by reading between the lines of an article, to discover some defamatory meaning therein is not sufficient to make it libelous. *Brown v. Lumber Co., supra; Reid v. Providence Journal Co.,* 20 R. I., 120.

In determining whether the article is libelous *per se* the article alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The article must be defamatory on its face "within the four corners thereof." *Key v. Armstrong, B. & Co.,* 5 A. L. R., 1349; *Oklahoma Publishing Co. v. Kendall,* 221 Pac., 762; *Phoenix Printing Co. v. Robertson,* 195 Pac., 487.

In speaking to the subject in *Shaw Cleaners & Dyers, Inc., v. Des Moines Press Club,* 86 A. L. R., 839, it is said: "In determining whether language is libelous *per se,* it must be viewed, stripped of any pleaded innuendo. The meaning of the phrase *'per se'* is 'taken alone, in itself, by itself.' Words which are libelous *per se* do not need an innuendo, and, conversely, words which need an innuendo are not libelous *per se.* . . . An innuendo cannot extend the sense of the expressions in the alleged libel beyond their own meaning."

The decisions in this jurisdiction, as well as others, clearly establish that a publication is libelous *per se,* or actionable *per se,* if, when considered alone without innuendo: (1) It charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt, or disgrace, or (4) it tends to impeach one in his trade or profession. *Shipp v. M'Craw,* 7 N. C., 463; *Sparrow v. Maynard,* 53 N. C., 195; *Barnes v. Crawford,* 115 N. C., 76; *Deese v. Collins,* 191 N. C., 749; *Lay v. Gazette Publishing Co.,* 209 N. C., 134; *Dudley v. Robinson,* 24 N. C., 141; *Ramsey v. Cheek,* 109 N. C., 270; *Logan v. Hodges,* 146 N. C., 38, 14 Ann. Cas., 103; *Jones v. Brinkley,* 174 N. C., 23; *Pentuff v. Park,* 194 N. C., 146, 53 A. L. R., 626; *Broadway v. Cope,* 208 N. C., 85; *Ivie v. King,* 167 N. C., 174; *Stevenson v. Northington,* 204 N. C., 690; *Ramsey v. Cheek,* 109 N. C., 270; *Osborn v. Leach,* 135 N. C., 628, 66 L. R. A., 648; *Lewis v. Carr,* 178 N. C., 578; *Carter v. King,* 174 N. C., 549; *Hedgepeth v. Coleman, supra; Hall v. Hall, supra; Paul v. Auction Co.,* 181 N. C., 1.

That a likeness of the plaintiff was used and the reference in the printed article would tend to identify her as another person is immaterial. Thus, in *Desando v. New York Herald Co.,* 85 N. Y. Supp., 111, it is held that a publication of a photograph in connection with an article which is libelous and which refers specifically to the photograph which accompanies it, entitles the person whose photograph is so published to maintain an action for libel, although another person's name is printed beneath the photograph and the article states facts tending to show that it was not the person referred to. See, also, *Morrison v. Smith,* 117 N. Y., 366, 69 N. E., 725; *Farley v. Evening Chronicle Publishing Co.,* 87 S. W., 565.

Construing the publication under consideration in accord with the rules laid down in the foregoing cited cases, and many others in this and other jurisdictions, we are led to the conclusion that it is not libelous *per se.*

As the publication is not libelous *per se,* there is no presumption of resulting damages. In this connection it is well to note that the only evidence of damage offered is included in the testimony of the plaintiff as follows: "The paper was sent to me by my mother while I was in New York. She sent the paper and wrote to me about it. At first, when I looked at the ad, I couldn't make out what it was all about, because at that time I was out of work. I wasn't with any band at the time and naturally my mother knew that and I thought perhaps she had gotten the idea I had joined this show and naturally it was quite an embarrassment. I just can't explain it to you—I really can't. It hurt me to think my picture would be published in connection with a show of this kind, because I have done all radio work and I have tried my best to accomplish something for my father and mother because it is through them and only through them that I have been able to realize my ambitions and naturally, when my picture appeared in the advertisement, it was—I was more hurt than embarrassed and naturally I wrote my mother and explained it to her. . . . After I saw this picture in the *Greensboro News* I wondered if a lot of people who saw me in the theatre would not see this picture in the *Greensboro Daily News* and probably think I was in a show like that."

The law seeks to compensate for damage to the person, the reputation or the property of an individual. It cannot and does not undertake to compensate for mere hurt or embarrassment alone.

Plaintiff does not allege or complain that there is any libel through the distortion of her photograph. In fact, she says it is a very good likeness, easily recognizable by her friends and acquaintances. What then does the publication say of and concerning the plaintiff when interpreted in its obvious and natural sense? (1) It represents her as saying that she has a sylph-like figure, which is, or may be, retained by eating more of Melts' rye and whole wheat bread. (2) It represents that she is Sally Payne, an exotic red-haired Venus; Venus being the goddess of beauty. (3) That she is a member of Folies de Paree, a sparkling Parisian revue stage production, which is to appear at the National Theatre two days only, 11 and 12 March. And (4) that she endorses and recommends Melts' rye and whole wheat bread and that it will give the necessary energy, pep and vitality without adding extra weight.

It cannot be said that either one of these representations tends to disgrace and degrade the plaintiff, or to hold her up to public hatred, contempt or ridicule or cause her to be shunned or avoided. Plaintiff's

principal complaint is concerning the inferential representation that she is a member of Folies de Paree, a sparkling Parisian revue stage production. "'A revue is a kind of burlesque or musical comedy in which recent events, esp. plays of the past year, are reviewed by imitations of their salient features and chief actors; also, loosely, a medley of songs, tableaux vivants, and chorus dances, with light skits." Webster's New International Dictionary, 2nd Ed. To recommend a legitimate article of merchandise and an item of daily food is not likely to subject one to ridicule or contempt. Vaudevilles and revues are recognized methods of furnishing public entertainment. We consider that it would be a strained and unreasonable interpretation of the law and the facts to hold that the mere representation that a person is a member of a legitimate and well recognized type of professional entertainment will subject that person to public hatred or obloquy. To do so would in effect hold that such type of entertainment is disreputable and those connected therewith are persons of ill-repute. This would constitute an unwarranted reflection upon and condemnation of many young ladies who earn their living in this manner. It may be that some connected with such groups are not all they should be, but such is the case in all other professions and callings. We do not feel that such a wholesale condemnation of any group is warranted by the language of this publication, nor can we conclude that there is any probability that any citizen other than the most morbid would so interpret it.

Apparently the plaintiff recognized that this publication was not subject to the interpretation that it was libelous *per se.* The complaint alleges to some extent the innuendo upon which she relies to make it so and she went to considerable length in offering evidence in an effort to establish that the publication when considered in connection with other facts and circumstances could reasonably be construed as a libelous article. That was the theory of the trial below.

As the plaintiff does not allege or attempt to prove any special damages and does not allege or attempt to prove that a libelous construction was placed upon the publication by those who saw it, and it not being libelous *per se,* it is unnecessary for us to further discuss libel *per quod* or to determine whether the publication under consideration is sufficient to constitute such a libel.

*Peck v. Tribune Co.,* 214 U. S., 185, 53 L. Ed., 960, relied on by plaintiff, presents a different factual situation which distinguishes that case from this. There a cut of Mrs. Peck was used, although under another name, as here, but the article of merchandise she was represented as approving and recommending was a certain brand of liquor. It was held that the advertisement obviously would hurt the plaintiff in the estimation of an important and respectable part of the community

and that it was libelous. In this we concur. In *Sydney v. Publishing Corp.*, 242 N. Y., 208, 44 A. L. R., 1419, the plaintiff, a married woman, was represented in a newspaper article as being the latest ladylove of Fatty Arbuckle. That and accompanying comments were such as to make the article libelous *per se.* / In *Burton v. Crowell Publishing Co.*, 2 Cir., 82 F, 2d, 154, 155, stressfully relied upon by the plaintiff, the picture of the plaintiff in that case was so caricatured as to expose the plaintiff to overwhelming ridicule. In that connection the Court said: "The contrast between the drawn and serious face and the accompanying fantastic and lewd deformity was so extravagant that though utterly unfair, it in fact made of the plaintiff a preposterously ridiculous spectacle and the obvious mistake only added to the amusement." We have examined the other authorities cited by plaintiff and find distinguishing features in each of the cited cases.

The defendants were entitled to a judgment of nonsuit on the cause of action for alleged libel.

Plaintiff's second cause of action is based upon the right of privacy, so termed. It is clear that the first issue, when considered in connection with the charge of the court, was submitted upon the theory of this cause of action.

Strictly speaking, there are no property rights. All rights are individual. A person has a right to the possession, control, use and disposition of property. This right is as personal as the right to individual liberty, free speech or any other like right possessed by a citizen. The individual right which relates to property is loosely termed a property right. Some of the cases dealing with the "right of privacy" treat it as a species of property right.

The question of the existence of this right is a relatively new field in legal jurisprudence. In respect to it the courts are plowing new ground and before the field is fully developed unquestionably perplexing and harassing stumps and runners will be encountered.

In determining to what extent a newspaper may publish the features of an individual under any given circumstances necessarily involves a consideration of the constitutional right of free speech and of a free press. People do not live in seclusion. When a person goes upon the street or highway or into any other public place he exhibits his features to public inspection. Is a newspaper violating any right of the individual, or doing more than exercising the right of a free press, when it publishes a correct image of such features? Must a distinction be drawn between those in private life and those in public office or public life, and if so, when does a person cease to be a private citizen and become a public character? If a newspaper may publish the features of an individual in connection with an article that is laudatory, does it not also

possess the right to publish the same in connection with an article that is critical in its nature so long as it speaks the truth? If the people are entitled to know what their Governor, or their President, or other public servant, is doing and saying, is it reasonable to hold that they are not entitled as a matter of course to ascertain and know through the newspapers his physical features and appearance? These and many other questions which may hereafter arise, in connection with this type of litigation, are not now before us for decision.

So far as we have been able to ascertain, no court has yet held that it constitutes a tort for a newspaper to publish an image of an individual when such publication is not libelous, except when such publication involves the breach of a trust, the violation of a contract, or when the photograph is used in connection with some commercial enterprise, and we are presently called upon to decide only the right of an individual to prohibit the unauthorized use of an image of her features and figure in connection with and as a part of an advertisement.

Seemingly, the first time this subject was called to public attention in America was through an article in the Harvard Law Review, Vol. 4, p. 193, published in 1890. In this article the existence of the right of privacy, as that term is ordinarily understood, was maintained. This article was followed by one published in Northwestern Law Review, Vol. 3, p. 1, in which the right of privacy was refuted. Without going into an extensive discussion of the origin and progress of this doctrine, the attention of those interested therein is directed to the case of *Roberson v. Rochester Folding Box Co.*, 171 N. Y., 538, 59 L. R. A., 478, in which *Parker, C. J.,* reviews all of the cases dealing with the subject, both English and American, to that date. The decision reverses the judgment of the court below in which an injunction was issued restraining the defendant from using the photograph of the plaintiff in connection with and as a part of an advertisement of flour, and denies the existence in the law of a right of privacy "founded upon the claim that a man has the right to pass through this world . . . without having his picture published, his business enterprises discussed, . . . or his eccentricities commented upon, . . . whether the comment be favorable or otherwise." In this case there is a strong and logical dissent by *Gray, J.,* concurred in by *Bartlett* and *Haight, JJ.* The subject is likewise dealt with at length in *Pavesich v. New England Life Insurance Co.*, 69 L. R. A., 101. All former decisions are likewise fully discussed in this opinion, in which the Court holds that the unauthorized publication of plaintiff's photograph in connection with an advertising enterprise gives rise to a cause of action. In the opinion *Coble, J.,* quoting at length and with approval from the dissenting opinion of *Gray, J.,* in *Roberson v. Rochester Folding Box Co., supra,* said in part: "Instan-

FLAKE *v.* NEWS CO.

taneous photography is a modern invention, and affords the means of securing a portraiture of an individual's face and form *in invitum* their owner.   While, so far forth as it merely does that, although a species of aggression, I concede it to be an irremediable and irrepressible feature of the social evolution.   But if it is to be permitted that the portraiture may be put to commercial or other use for gain by the publication of prints therefrom, then an act of invasion of the individual's privacy results, possibly more formidable and more painful in its consequences than an actual bodily assault might be.   Security of person is as necessary as the security of property; and for that complete personal security which will result in the peaceful and wholesome enjoyment of one's privileges as a member of society there should be afforded protection, not only against the scandalous portraiture and display of one's features and person, but against the display and use thereof for another's commercial purposes or gain.   The proposition is, to me, an inconceivable one that these defendants may, unauthorizedly, use the likeness of this young woman upon their advertisement as a method of attracting widespread public attention to their wares; and that she must submit to the mortifying notoriety, without the right to invoke the exercise of the preventive power of a court of equity.   .   .   .

"I think that this plaintiff has the same property in the right to be protected against the use of her face for defendants' commercial purposes as she would have if they were publishing her literary compositions. The right would be conceded if she had sat for her photograph; but if her face or her portraiture has a value, the value is hers exclusively, until the use be granted away to the public.   Any other principle of decision, in my opinion, is as repugnant to equity as it is shocking to reason. . . .

"It would be, in my opinion, an extraordinary view, which, while conceding the right of a person to be protected against the unauthorized circulation of an unpublished lecture, letter, drawing, or other ideal property, yet would deny the same protection to a person whose portrait was unauthorizedly obtained and made use of for commercial purposes. .   .   .   Whether, as incidental to that equitable relief, she would be able to recover only nominal damages, is not material, for the issuance of the injunction does not, in such a case, depend upon the amount of the damages in dollars and cents."

We are of the opinion that the reasoning in the *Pavesich case, supra,* is sound and establishes the correctness of the conclusion that the unauthorized use of one's photograph in connection with an advertisement or other commercial enterprise gives rise to a cause of action which would entitle the plaintiff, without the allegation and proof of special damages, to a judgment for nominal damages, and to injunctive relief, if and when the wrong is persisted in by the offending parties.

One of the accepted and popular methods of advertising in the present day is to procure and publish the endorsement of the article being advertised by some well-known person whose name supposedly will lend force to the advertisement. If it be conceded that the name of a person is a valuable asset in connection with an advertising enterprise, then it must likewise be conceded that his face or features are likewise of value. Neither can be used for such a purpose without the consent of the owner without giving rise to a cause of action.

We conclude, therefore, that there was error in the judgment below and that the motion of the defendants for a judgment of nonsuit should have been sustained as to plaintiff's cause of action sounding in libel and that there should be a new trial on the cause of action alleging the unauthorized use of the image of plaintiff's features and person in connection with said advertisement. Upon the present record, from which it appears that said photograph was used by mistake and without malice and that the defendants immediately desisted from the use thereof upon the discovery of the mistake and made due apology therefor, the plaintiff would be entitled to a judgment for nominal damages only. As the defendants have not and did not persist in the wrong complained of, the right to injunctive relief is not here involved.

New trial.