CALABRIA, Judge.
Grant Dawson ("Dawson") and Greensboro Scuba School, LLC ("Greensboro Scuba") (collectively with Dawson, "plaintiffs") appeal the order by Judge Webb granting defendant Dolphia "Dolphi" Graves' ("Graves") motion for summary judgment as well as Judge Bray's order granting defendant James Robertson's ("Robertson") (collectively with Graves, "defendants") motion for directed verdict and defendants' motion to tax costs and attorneys' fees.
I. Background
Dawson is the principal operator and instructor at Greensboro Scuba, a dive shop located in Brown Summit, North Carolina. Robertson, a former scuba instructor, is the Executive Secretary of the Piedmont Diving and Rescue Association ("PDRA"), a group of scuba diving clubs located in central North Carolina that operates several former rock quarries used for scuba diving instruction and practice. Graves owns and manages a dive shop located in Greensboro, North Carolina, known as North American Divers Company, Inc. ("NADCO").
The PDRA allows certified diving instructors who have been approved by the association to hold scuba diving classes in its quarries. Many of those classes are held to support such instructors' private businesses. Both being certified diving instructors, Graves used PDRA's quarries to conduct scuba classes for customers of NADCO and Dawson did the same for customers of Greensboro Scuba. During the course of 2008, however, several members of the PDRA filed complaints against Dawson, one of which alleged that he had used threatening and abusive language toward another PDRA member or representative. Those complaints, which were heard and considered by the PDRA's Instructor Committee and Board of Directors, ultimately led to the suspension of Dawson's PDRA membership and privileges for the remainder of 2008. Pursuant to the terms of his suspension, Dawson was restricted from using or accessing any of the PDRA's diving quarries. Though Dawson was allowed to reapply for his PDRA instructor permit in 2009 or any time thereafter, he never did so.
At some point in 2011, Joe Holcombe ("Holcombe"), a volunteer with the Old North State Council division of Boy Scouts of America, approached Dawson about conducting scuba diving classes. The idea was to afford local Boy Scouts an opportunity to earn scuba diving merit badges. Holcombe succeeded in organizing one scuba diving class, which was taught by Dawson. Twenty-six students finished the class, but it is not clear how many were Boy Scouts. Holcombe planned to organize, and have Dawson conduct, two more scuba merit badge classes in 2012.
When a local Boy Scout wished to receive a scuba merit badge, Randy Mintz ("Mintz"), Chairman of the Old North State Council Aquatics Committee, would inform him of the qualifying scuba classes that were available. In early 2012, Mintz and Holcombe were in contact about Holcombe's efforts to organize scuba classes. Up to that point, NADCO had been the primary provider of scuba instruction for local Boy Scouts. Holcombe sought Mintz's support for the merit badge classes he planned to organize with Dawson, and he wanted the Aquatics Committee to send out contact information for Greensboro Scuba.
While organizing information on scuba merit badge classes and other aquatic activities, Mintz telephoned Graves on 2 April 2012. During the course of that conversation, Dawson's name came up, and Graves told Mintz "to be careful" and to "call ... Robertson at the PDRA" because Graves believed Dawson had been "banned from the rock quarry." As a result, Mintz called Robertson, who stated that Dawson had been "banned" from the PDRA's quarry, that there had been "some question" regarding Dawson's liability insurance, and that Dawson had used "some kind" of "abusive" and "obscene" language toward another PDRA member. After his conversation with Robertson, Mintz's Aquatics Committee discussed "concerns" related to Holcombe's plans to offer scuba merit badge classes for Boy Scouts, which included the committee's liability, Holcombe's current status in the Boy Scout organization, and Dawson's banishment from the PDRA's quarry.
After several discussions with Holcombe, Mintz concluded that the issues and concerns identified by the Aquatics Committee had been cleared up. Consequently, in June 2012, the Aquatics Committee sent an email to Old North State Council Boy Scouts listing two providers of scuba merit badge classes-(1) NADCO's Graves and (2) Holcombe, with Dawson and Greensboro Scuba providing the instruction. There is no indication that any Boy Scouts or their parents were informed of the Aquatics Committee's previous concerns surrounding Dawson. Even so, Holcombe never scheduled or organized any additional scuba diving classes with Dawson or other instructors.
On 8 March 2013, plaintiffs filed an amended complaint in Guilford County Superior Court, alleging that defendants interfered with their ability to run scuba classes for Boy Scouts by making defamatory statements about Dawson's character and insurance. Plaintiffs also alleged that the statements amounted to Unfair and Deceptive Trade Practices and entitled them to punitive damages.
In September 2013, defendants filed a joint motion for summary judgment, which was granted as to Graves but denied as to Robertson. In January 2014, plaintiffs' claims against Robertson proceeded to trial, where Robertson's motion for a directed verdict at the close of plaintiffs' evidence was denied. At the close of all evidence, Robertson renewed his motion for a directed verdict and the trial court granted it. By way of a written judgment entered 1 May 2014, the trial court found that there was "no genuine issue as to any material fact regarding" plaintiffs' "claims against ... Robertson," and concluded that Robertson's motion for directed verdict was properly granted. The court also granted defendants' motion to tax attorneys' fees to plaintiffs pursuant to N.C. Gen.Stat. §§ 1D-45 and 75-16.1. Plaintiffs appeal.
II. Analysis
A. Graves' Motion for Summary Judgment
Plaintiffs first argue that the trial court erred in granting Graves' motion for summary judgment. We disagree.
"Our standard of review of an appeal from summary judgment is de novo;such judgment is appropriate only when the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " In re Will of Jones,362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting Forbis v. Neal,361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007) ). "In ruling on a motion for summary judgment the evidence is viewed in the light most favorable to the nonmoving party." Hinson v. Hinson,80 N.C.App. 561, 563, 343 S.E.2d 266, 268 (1986) (citation omitted). "A defendant may show entitlement to summary judgment by (1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense." Draughon v. Harnett Cty. Bd. of Educ.,158 N.C.App. 705, 708, 582 S.E.2d 343, 345 (2003) (internal quotation marks omitted) (citation omitted). Furthermore, if a grant of summary judgment "can be sustained on any grounds, it should be affirmed on appeal." Shore v. Brown,324 N.C. 427, 428, 378 S.E.2d 778, 779 (1989).
On 2 April 2012, Mintz called Graves and offered to send information on NADCO to Boy Scouts interested in taking classes to earn their scuba diving merit badges. Upon learning that plaintiffs would also be offering scuba diving classes to interested Boy Scouts, Graves told Mintz that he needed "to be careful." Graves also said to Mintz, "[y]ou need to call ... Robertson at PDRA, because I believe ... Dawson has been banned from the rock quarry."
Plaintiffs contend that Graves slandered them by making these statements to Mintz. According to plaintiffs, "[e]ven though [Graves] was not asked to comment [on Dawson], [Graves] volunteered a false statement to [Mintz] which he knew would ... impugn [plaintiffs] in [their] profession."
"In order to recover for defamation, a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." Boyce & Isley, PLLC v. Cooper,153 N.C.App. 25, 29, 568 S.E.2d 893, 897 (2002). Whether a statement is defamatory per seis a question of law. See, e.g ., Ellis v. N. Star Co.,326 N.C. 219, 224, 388 S.E.2d 127, 130 (1990). North Carolina Courts "have long recognized two actionable classes of oral defamation: slander per seand slander per quod[.]" Donovan v. Fiumara,114 N.C.App. 524, 527, 442 S.E.2d 572, 574 (1994). Slander per seis a statement to a third party which is "(1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." Boyce & Isley, PLLC,153 N.C.App. at 29-30, 568 S.E.2d at 898 (citation omitted). With respect to a trade or profession, an allegedly slanderous statement must "touch the plaintiff in his special trade or occupation, and ... must contain an imputation necessarily hurtful in its effect on his business." Badame v. Lampke,242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955).
When a plaintiff alleges that statements are slanderous per se,the words used " 'must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided .' " Boyce & Isley, PLLC,153 N.C.App. at 30-31, 568 S.E.2d at 898-99 (citation omitted). In making this determination, the court considers the statement alone without any explanatory circumstances, insinuations, innuendo, or colloquium. See, e.g., Flake v. Greensboro News Co.,212 N.C. 780, 787, 195 S.E. 55, 60 (1938) ; Nucor Corp. v. Prudential Equity Group, LLC,189 N.C.App. 731, 736, 659 S.E.2d 483, 487 (2008). Because a plaintiff alleging slander per semust show that the statement was false, the truth of the statement is a complete defense. See Martin Marietta Corp. v. Wake Stone Corp.,111 N.C.App. 269, 276, 432 S.E.2d 428, 433 (1993).
The first statement attributed to Graves, that Mintz needed "to be careful" in associating with Dawson, is innocuous on its face, and it certainly fails to reach the necessary threshold once "stripped of all insinuations, innuendo, colloquium and explanatory circumstances." Flake,212 N.C. at 787, 195 S.E. at 60. The second statement attributed to Graves, that he believed Dawson "ha [d] been banned from the rock quarry," also fails to reach the necessary threshold. Indeed, the subjective nature of Graves' statement is demonstrated by his beliefthat Dawson had been banned from the rock quarry and informed by his opinion that Mintz needed "to be careful" before promoting Dawson as a scuba instructor for Boy Scouts.
We also find this Court's decision in Pierce v. Atl. Grp., Inc.,219 N.C.App. 19, 724 S.E.2d 568 (2012) to be particularly on point here. In Pierce,a fired power plant employee alleged that his former employer defamed him by (1) sending an email claiming that the employee had falsified his timesheet and (2) issuing a report "to the Nuclear Regulatory Commission, barring [the employee] from 'unescorted access to facilities around the nation.' " 219 N.C.App. at 23, 724 S.E.2d at 572. After concluding that neither of the alleged defamatory statements held the employee "up to public hatred, contempt, or ridicule, or cause[ed] him to be shunned and avoided [,]" id.at 34, 724 S.E.2d at 579 (citation omitted), the PierceCourt observed that "North Carolina cases have held consistently that alleged false statements made by defendants, calling plaintiff 'dishonest' or charging that plaintiff was untruthful and an unreliable employee, are not actionable per se." Id.at 35, 724 S.E.2d at 579 (citing Stutts v. Duke Power Co.,47 N.C.App. 76, 82, 266 S.E.2d 861, 865 (1980) ). As a result, the former employee's claim of libel per sehad been properly dismissed by the trial court. Id.
Graves' alleged statement that he thought Dawson was "banned" from the rock quarry is materially indistinguishable from the report in Piercethat the employee was "barred" from certain facilities. Moreover, as explained below, the statement was true. Accordingly, since Graves' statements do not rise to the level of slander per se,and plaintiffs could not overcome his affirmative defense of truth, the trial court properly granted Graves' motion for summary judgment.
B. Robertson's Motion for Directed Verdict
Next, plaintiffs contend that the trial court erred by granting Robertson's motion for directed verdict.
When reviewing the grant of a directed verdict, we look to whether the evidence was sufficient as a matter of law to be submitted to the jury. Davis v. Dennis Lilly Co.,330 N.C. 314, 322, 411 S.E.2d 133, 138 (1991) (citing Kelly v. Int'l Harvester Co.,278 N.C. 153, 179 S.E.2d 396 (1971) ). "In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor."Turner v. Duke Univ.,325 N.C. 152, 158, 381 S.E.2d 706, 710 (1989). If more than a scintilla of evidence exists to support each element of the non-moving party's claim, the court should deny a motion for a directed verdict. Weeks v. Select Homes, Inc.,193 N.C.App. 725, 730, 668 S.E.2d 638, 641 (2008).
After his 2 April 2012 conversation with Graves, Mintz called Robertson on the same day to inquire about Dawson. According to Mintz, Robertson responded to that inquiry as follows:
He told me that [Dawson] had been banned from the rock quarry by PDRA, and was not allowed to work there. He told me that he-that there had been some question about whether Mr. Dawson had had the proper liability insurance while he was working there. There had been some kind of incidents of bad language, abusive, some kind of obscene language that had happened, and they had-they had removed him.
The long and the short of plaintiffs' argument is that all of Robertson's statements were false and "necessarily hurtful to [their] trade or business."
As to Robertson's statement that Dawson had been "banned" from the rock quarry, we find it equally harmless as Graves' statement on the issue. Furthermore, the statement was true. As part of his 2008 suspension from the PDRA, Dawson was restricted from using or accessing any of the organization's quarries. Particularly telling is the following exchange that occurred between defense counsel and Dawson at trial:
Q So as it stands today, as it stood in 2012, as it has stood since 2008, you do not have access to the quarry that's operated by the PDRA; is that correct?
A That is correct.
...
Q. So in essence, if someone were to say that you were restricted from access to the quarry, that would be an accurate statement, wouldn't it?
A. Yes.
Even so, plaintiffs insist that Robertson's use of the word "banned" in his statement to Mintz is crucial to its allegedly slanderous character. The word "banned," however, is tantamount to "barred" or "excluded," both of which accurately described the status of Dawson's access to the PDRA's quarries. As a result, this argument, which is based entirely on semantics, is not convincing.
The record also indicates that the other statements attributed to Robertson, that there had been "some question" about Dawson's liability insurance and that Dawson had used "abusive" and "obscene" language, were both true. Although Dawson testified that he had maintained the required insurance continuously from 1982, the documentary evidence he presented at trial exposed a gap in coverage from 2005 to 2006. Consequently, Robertson's assertion that there had been some "question" regarding Dawson's liability insurance was truthful. So too was Robertson's statement about Dawson's use of offensive language. In 2008, while addressing the issue of his membership, the PDRA considered several complaints against Dawson, including an allegation that he had used belligerent and threatening language toward the PDRA's President's wife. As defendants point out, although Dawson denied ever using such language toward scuba students,"not once during his trial testimony did he even address much less deny the specific complaint of 'abusive language' which, in part, led to his removal from the PDRA." As a result, there was uncontroverted evidence establishing that Dawson had used "offensive" and "abusive" language.
Even if these statements were not true, our appellate courts have set a high bar for plaintiffs alleging libel or slander per se. See Stutts,47 N.C.App. at 82, 266 S.E.2d at 865 (employer's statements that the plaintiff was terminated for his dishonest and untruthful acts were not defamatory per se); Penner v. Elliott,225 N.C. 33, 34, 33 S.E.2d 124, 125 (1945) (statement that the plaintiff would not pay his debts, would not work, and was "a man that respectable people had best not have anything to do with" was not slanderous per se); Robinson v. Nationwide Ins. Co.,273 N.C. 391, 395, 159 S.E.2d 896, 899 (1968) (insurance company's statement that it was cancelling the plaintiff's policy because of his unfavorable personal habits was not libelous per se); Long v. Vertical Techs.,113 N.C.App. 598, 603, 439 S.E.2d 797, 801 (1994) (statement insinuating that workers "were not handling business correctly and ... [were] doing something 'shady' " was insufficient to survive summary judgment on a claim for slander per se); Gibson v. Mutual Life Ins. Co. of N.Y.,121 N.C.App. 284, 289, 465 S.E.2d 56, 60 (1996) (statement by employer alleging that the plaintiff, a former employee, "had lied to him and could not be trusted" was not slanderous per se). Robertson's statements, if disparaging at all, certainly are no more severe than accusations of dishonesty, unfavorable personal habits, or characterizations of a person as a dead-beat.
When viewed in the light most favorable to plaintiffs, the evidence presented at trial established the truth of Robertson's statements, which in turn provided him a complete defense to plaintiffs' defamation claim. Moreover, under North Carolina law, Robertson's statements did not constitute slander per se.
Nevertheless, we must also review the trial court's decision to direct the verdict on the issue of slander per quod,which "involves a spoken statement of which the harmful character does not appear on its face as a matter of general acceptance, but rather becomes clear 'only in consequence of extrinsic, explanatory facts showing its injurious effect....' " Fiumara,114 N.C.App. at 527, 442 S.E.2d at 574-75 (quoting Lampke,242 N.C. at 757, 89 S.E.2d at 467 ). In the context of a claim for slander per quod,"the injurious character of the words and some special damage must be pleaded and proved." Beane v. Weiman Co., Inc.,5 N.C.App. 276, 278, 168 S.E.2d 236, 238 (1969) (citations omitted). Special damages, as that term is used in defamation actions, "means pecuniary loss, as distinguished from humiliation." Williams v. Rutherford Freight Lines, Inc.,10 N.C.App. 384, 387, 179 S.E.2d 319, 322 (1971) (citations omitted).
In the instant case, all of Robertson's statements were true, which means they were not actionable per quod.In addition, plaintiffs failed to provethat they suffered any pecuniary loss due to the allegedly slanderous statements. As the trial court noted in its written judgment, Mintz, as plaintiffs' "sole first-hand witness regarding the statements[,]" specifically "testified that the Boy Scouts took no negative action whatsoever against ... [p]laintiffs after the alleged statements were made." We agree with the trial court's analysis that plaintiffs lacked evidence demonstrating "that [they] had been damaged in any way by [defendants'] statements." Because plaintiffs failed to prove any pecuniary loss, there were no special damages. The trial court therefore properly granted Robertson's motion for directed verdict on the issue of slander per quod.
C. The Trial Court's Award of Attorneys' Fees
Finally, plaintiffs argue the trial court erred in awarding attorneys' fees to defendants. Once again, we disagree.
In its written judgment, the trial court concluded that defendants were entitled to an award of attorneys' fees under both N .C. Gen.Stat. §§ 1D-45 and 75-16.1. "To prevail on [their] claim of unfair and deceptive trade practices," plaintiffs were required to show: "(1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff[s] w[ere] injured thereby." Castle McCulloch, Inc. v. Freedman,169 N.C.App. 497, 500, 610 S.E.2d 416, 419 (2005) ; N.C. Gen.Stat. § 75-1.1 (2013). Plaintiffs' amended complaint alleged that defendants' statements to Mintz constituted unfair and deceptive trade practices and caused actual injury to plaintiffs. Section 75-16.1 provides that
[i]n any suit instituted by a person who alleges that the defendant violated G.S. 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee ... to be taxed as a part of the court costs and payable by the losing party, upon a finding by the presiding judge that: ... (2) The party instituting the action knew, or should have known, the action was frivolous and malicious.
N.C. Gen.Stat. § 75-16.1 (2013). "A claim is frivolous if a proponent can present no rational argument based upon the evidence or law in support of [it]. A claim is malicious if it is wrongful and done intentionally without just cause or excuse or as a result of ill will." Blyth v. McCrary,184 N.C.App. 654, 663 n. 5, 646 S.E.2d 813, 819 n. 5 (2007) (internal citations and quotation marks omitted).
Because section 75-16.1 vests trial courts with the discretionary authority to award attorneys' fees, such awards are reviewed for abuse of discretion. GE Betz, Inc. v. Conrad,--- N.C.App. ----, ----, 752 S.E.2d 634, 654 (2013). A trial court abuses its discretion only when its award of attorneys' fees is "manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision." Stilwell v. Gust,148 N.C.App. 128, 130, 557 S.E.2d 627, 629 (2001), (quoting Thorpe v. Perry-Riddick,144 N.C.App. 567, 569, 551 S.E.2d 852, 855 (2001) ).
Our review of the trial court's written judgment reveals that plaintiffs' claims could be fairly characterized as frivolous and malicious. To support its award of attorneys' fees, the trial court found that plaintiffs "could not obtain ... evidence to support two crucial elements of their claim[s]" (1) that defendants' statements were defamatory under North Carolina case law and (2) that plaintiffs "had been damaged in any way by those statements." The court also found that plaintiffs "were unable after being given a full course of discovery to point to any evidence at all upon which a claim based on slander could have been submitted to the jury." Finally, the court found that defendants' "alleged statements, as recounted by ... Mintz, clearly do not amount to defamation per se" and that this "would have been apparent to ... [p]laintiffs with [even] a cursory search of North Carolina" defamation law. Suffice it to say that both the record and the pertinent case law support the trial court's findings.
Moreover, the trial court was "persuaded [that] under precedent such as Castle McCulloch, Inc. v. Freedman,... [p]laintiffs' claim was not simply unmeritorious but also ... 'frivolous andmalicious' under ... [section] 75-16.1." In Castle McCullough,a bridal/wedding show producer brought an unfair and deceptive trade practice action, alleging that a competitor had damaged the producer's business by circulating a deceptive survey and advertisement. 169 N.C.App. at 499, 610 S.E.2d at 419. This Court upheld a directed verdict granted in favor of the competitor, concluding that, in terms of its damages claim, the producer had "merely speculated as to the number of vendors that would have attended the bridal show but for [the competitor's] survey." Id.at 502, 610 S.E.2d at 420. The Castle McCulloughCourt also held that the competitor was properly awarded attorneys' fees under section 75-16.1 because the producer failed to "offer the testimony of any vendor that left its wedding show because of [the competitor's] tip sheet or questionnaire." Id.at 504, 610 S.E.2d at 422.
Here, as in Castle McCullough,plaintiffs' claim for damages was entirely speculative. Indeed, plaintiffs failed to produce any evidence that they lost the Boy Scouts' or other business as a result of defendants' alleged statements. Accordingly, because the trial court's finding of frivolous andmalicious was supported by the record and its conclusion was not manifestly unsupported by reason, we discern no abuse of discretion in its decision to award attorneys' fees under section 75-16.1. Given our conclusion on this issue, the trial court properly cited section 1D-45 -which requires that a claim be frivolous ormalicious-as an alternative basis for its attorneys' fees award.
III. Conclusion
Under North Carolina case law, the alleged defamatory statements were neither actionable per senor per quod.Furthermore, the truth of defendants' alleged statements afforded them both a complete defense to plaintiffs' slander claim. As a result, the trial court properly granted Graves' motion for summary judgment and Robertson's motion for directed verdict. Finally, the trial court did not abuse its discretion in awarding defendants attorneys' fees pursuant to section 75-16.1.
AFFIRMED.
Judges McCULLOUGH and DIETZ concur.
Report per Rule 30(e).
Opinion
Appeal by plaintiffs from orders entered 16 October 2013 and 1 May 2014 by Judge James M. Webb and Judge Susan E. Bray, respectively, in Guilford County Superior Court. Heard in the Court of Appeals 3 March 2015.