**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1287**

MYGALLONS LLC,

                Plaintiff - Appellee,

        and

ZENACON LLC; STEVEN VERONA,

                Plaintiffs,

        v.

U.S. BANCORP; VOYAGER FLEET SYSTEMS, INC.,

                Defendants - Appellants,

        and

K.E. AUSTIN CORP.,

                Defendant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington.  W. Earl Britt, Senior District Judge.  (7:09-cv-00057-BR)

Argued:  March 20, 2013                Decided:  May 31, 2013

Before NIEMEYER, MOTZ, and KEENAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished opinion.  Judge Niemeyer wrote the opinion, in which Judge Motz and Judge Keenan joined.

**ARGUED:** Johnny Morgan Loper, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Raleigh, North Carolina, for Appellants. Gary Walker Jackson, JACKSON & MCGEE, LLP, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Lewis A. Remele, Jr., Christopher R. Morris, BASSFORD REMELE, PA, Minneapolis, Minnesota, for Appellants. Marcus S. McGee, JACKSON & MCGEE, LLP, Charlotte, North Carolina; Sherrie R. Savett, Douglas M. Risen, Russell D. Paul, Jacob M. Polakoff, BERGER & MONTAGUE, PC, Philadelphia, Pennsylvania, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

MyGallons LLC, a Florida company that had not yet begun doing business, sent out a press release on June 30, 2008, announcing the launch of a nationwide prepaid gas program using the Voyager payment network operated by Voyager Fleet Systems, Inc. ("Voyager"), a subsidiary of U.S. Bancorp (collectively "USB"). MyGallons and USB had been in discussions about using the Voyager network to back the issuance of prepaid gas cards but had not yet reached final agreement. In response to MyGallons' press release, USB released a series of "desk statements" that, in effect, denied any connection or affiliation with MyGallons. As a consequence, MyGallons' announcement was distrusted, and it subsequently received an "F" rating from the Better Business Bureau of Southeast Florida; was labeled a "scam" in the media; and was unable to secure another payment processor for its prepaid gas program.

MyGallons commenced this action for defamation, breach of contract, and related claims, and after a trial, a jury awarded MyGallons $4 million in damages on the defamation claim. USB now appeals, contesting both the jury's finding of defamation and its award of damages.

We conclude that sufficient evidence was presented to the jury to enable a reasonable jury to have found that USB defamed MyGallons. But we also conclude that the damage award was

3

either excessive or unsupported because the expert testimony at the heart of the award was admitted in violation of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Accordingly, we affirm the verdict on liability, vacate the award of damages, and remand for a new trial on damages.

I

In early 2008, Steven Verona contacted Voyager to discuss piloting his prepaid consumer gas program. Under the program, members would pay an annual fee and be able to purchase a card prepaying gas at a designated price and thus be able to buy gas later at the prepaid price. Voyager, a wholly-owned subsidiary of U.S. Bank National Association ND, in turn a wholly-owned subsidiary of U.S. Bancorp, operated a payment processing network for commercial and fleet gas purchases, using fleet cards. Its program focused on commercial and government fleets, and about 95% of the service stations nationwide accepted payment through Voyager's network. Voyager was not, however, set up to provide the disclosures necessary for the issuance of consumer gas cards.

After Verona explained his prepaid gas program to USB executives, the executives explained that USB would not work directly with Verona or any company of his until the program reached a certain size. One of the executives directed Verona

4

to work with a "channel partner," an authorized reseller of the Voyager payment processing system, specifically recommending USB's channel partner K.E. Austin Corp., operating as "GoGas."

In March 2008, Verona submitted a fleet card application to GoGas through Zenacon LLC, a company that he had previously created for ownership of his various inventions. Verona informed GoGas that this was the pilot program for a larger consumer venture. GoGas forwarded Zenacon's application to USB, which approved it. USB then issued Zenacon several dozen cards using the Voyager payment network, which Verona distributed to family and friends, who had been identified as employees in Zenacon's application. These individuals thereafter used the fleet cards to purchase gas.

Soon thereafter, Verona decided to brand his consumer prepaid gas program "MyGallons," and on April 14, 2008, he formed MyGallons LLC, a Florida limited liability company. GoGas then requested that USB transfer Zenacon's account to MyGallons. The account, however, was never formally transferred. But an internal USB communication from June 2008 stated that "MyGallons is an approved Voyager fleet card account under the K.E. Austin GoGas channel partner program," and "we are working to expand the program to a direct relationship with U.S. Bank and provide MyGallons with its own account to offer prepaid relationship[s] to its members." And by June 27, USB

5

was in the process of drafting a new contract for its direct relationship with MyGallons. In the meantime, USB employees worked with GoGas and Verona to design fleet cards with the logos of both MyGallons and Voyager on them, even though up until that time the only cards in active use were those that had been issued pursuant to the agreement between GoGas and Zenacon.

On June 30, 2008, MyGallons publicly announced the launch of its prepaid gas program with a press release titled "MyGallons Provides Americans with a Solution to Fight Rising Gas Prices: Fixed Price Gas Savings Program Allows Consumers to Save Money by Buying Tomorrow's Gas at Today's Prices." The press release stated that "MyGallons offers its members convenience and freedom as the gas redemption program uses the Voyager fleet network, operated by U.S. Bank, which is accepted at over 95% of gas stations nationwide." Verona did not, however, alert USB to the press release in advance, and USB stated that it was unaware of the <u>consumer</u>, rather than <u>commercial</u>, nature of MyGallons' business plan until the press release.

The MyGallons announcement was widely picked up by the media, including Time Magazine, U.S. News and World Report, CBS Early Show, ABC Evening News, and CNN International, and Verona was interviewed on Good Morning America. Within days of the launch, MyGallons had over 6,000 members who had paid the annual

6

fee, and even after MyGallons stopped accepting memberships because it lacked a payment processor, approximately 25,000 to 30,000 additional people attempted to sign up.

The day after MyGallons' announcement, on July 1, 2008, USB's counsel emailed Verona, stating in relevant part:

> This communication is to inform you that there is no agreement in place between MyGallons and U.S. Bank or Voyager for such a program as described on the MyGallons website. MyGallons had not communicated to Voyager that any potential program between MyGallons and Voyager was or is for consumer use. MyGallons also has no approval from U.S. Bank or Voyager to use Voyager's marks, or to issue a press release naming either U.S. Bank or Voyager. . . . U.S. Bank further informs MyGallons that neither U.S. Bank nor Voyager will enter into any agreement with MyGallons as contemplated and described on MyGallons' website.
>
> We also understand you executed, as the president and chairman of a company called Zenacon, LLC, a GoGas Commercial Fleet Card application and agreement in April, 2008 (the "Agreement"). We further understand that Zenacon may be issuing cards to consumers, under a similar model to the program described on the MyGallons website. This constitutes an unauthorized use of commercial fleet cards, and a breach of the terms and conditions set forth in the Commercial Fleet Card. We are terminating this Agreement immediately.

Later that day, USB held a telephone conference call with Verona to inform him that USB could not participate in the venture because Voyager did not deal in direct <u>consumer</u> transactions.

Concerned over being associated with a fuel hedging program, USB decided to prepare a "desk statement" to respond to media inquiries, which it subsequently shared with a number of

7

media outlets.  Its initial statement, dated July 1, 2008, provided:

> U.S. Bank Voyager Fleet Systems does not have a contract to do business with MyGallons.com.  We did not authorize the use of our name in association with this venture and we are not affiliated with this company.

After counsel for MyGallons requested that the "no affiliation" phrase be removed, Voyager revised the statement to provide:

> Neither U.S. Bank National Association ND, nor Voyager Fleet Systems, Inc. have a contract to do business with MyGallons.com, LLC, and there are no ongoing negotiations to enter into any agreement with MyGallons.

Voyager then revised the statement a final time, to provide:

> Neither U.S. Bank National Association ND, nor Voyager Fleet Systems, Inc. has a contract to do business with MyGallons LLC, and there are no ongoing negotiations to enter into any agreement with MyGallons.
>
> We did have a commercial fleet fuel card contract with Zenacon LLC through our partnership with third-party marketer GOGAS Universal, however it was for the exclusive purpose of providing commercial fleet fueling and maintenance cards, not consumer cards.

Negative press about MyGallons ensued.  The Better Business Bureau of Southeast Florida gave MyGallons an "F" rating, warning consumers to "beware."  Similar Internet postings and articles followed, with MyGallons being labeled a "scam." MyGallons stopped signing up members and refunded all monies that had been collected from members.

Despite contacting numerous companies during the days that followed, including Visa, MasterCard, Discover, American

8

Express, NYC Network, Comdata, and Legacy, MyGallons was unable to secure a replacement payment processing network. Verona testified that a number of companies refused immediately, without meeting or engaging in further communication. Verona also asked Melody Wigdahl, an independent contractor who specialized in payment solutions for corporate clients, to help find an alternate payment processor. Wigdahl's communication to Verona at the time of her search emphasized the barriers that had been created by the negative publicity about MyGallons. When testifying in deposition, however, she focused on the obstacles created by the type of platform sought by MyGallons and its lack of funding. She also testified that Verona's reputation was a problem.

On July 7, 2008, GoGas authorized Verona to issue a statement which provided:

> GoGas had agreements in place with Zenacon LLC and MyGallons LLC in order to provide support for the MyGallons program through the use of the Voyager payment processing network. We believe the MyGallons program is an innovative business and it could offer Americans relief at the pump. . . . We are sorry that MyGallons and their launch have been harmed by the release of incorrect information and confusing statements resulting in negative press.

Verona, MyGallons, and Zenacon commenced this action in August 2008 against U.S. Bancorp, Voyager, and GoGas for breach of contract, promissory estoppel, and tortious interference with contract and prospective contractual relations. The plaintiffs

alleged additional claims against U.S. Bancorp and Voyager for defamation, disparagement/injurious falsehood, and false light publicity. Voyager filed counterclaims against the plaintiffs, including a claim for breach of contract against Verona and Zenacon for failing to pay the charges made on the issued gas cards.

The action was initially filed in the Eastern District of Pennsylvania. When GoGas filed a motion to dismiss for lack of personal jurisdiction, the court transferred the case to the Eastern District of North Carolina. Thereafter, the plaintiffs amended their complaint to add claims for unfair and deceptive trade practices. They ultimately dismissed their claims against GoGas.

Prior to trial, the district court dismissed Verona's individual claims for breach of contract and promissory estoppel and all claims for tortious interference, false light publicity, and unfair trade practices. It also denied USB's motion filed under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to exclude the testimony of the plaintiff's two expert witnesses, Dr. Anca Micu and Paul Seitz.

At the conclusion of the plaintiffs' case at trial, the district court granted USB's motion for judgment as a matter of law on all of Zenacon's claims, except for its breach of contract claim, and all of Verona's claims. The court submitted

10

the remaining claims to the jury, which included MyGallons' claims against USB for (1) breach of contract, (2) promissory estoppel, and (3) defamation; Zenacon's claim for breach of contract; and Voyager's counterclaim against Verona and Zenacon for breach of contract.

In its verdict, the jury found for USB on Zenacon and MyGallons' breach of contract claims and on MyGallons' promissory estoppel claim. It found for MyGallons on its defamation claim against U.S. Bancorp and Voyager, awarding MyGallons $4 million in damages. And it found for Voyager on its breach of contract counterclaim against Verona and Zenacon, awarding it $1,096 in damages.

USB moved for judgment as a matter of law, or in the alternative, for a new trial on damages or for a remittitur. The court denied the motion. It upheld the defamation claim because "[a] reasonable jury could have found one or more of the defendants' statements to be false." The court declined to alter the damages, finding that although it was unclear whether the jury gave any special damages, if they did award special damages, "[a] reasonable jury could have concluded that defendants' defamatory statements caused MyGallons's inability to secure an alternative card processing network which, in turn, caused MyGallons to suffer pecuniary loss." The court did, however, state that "[i]f the jury had awarded $4,000,000

11

exclusively for general damages, the court might be inclined to agree with defendants' position that such award is excessive given MyGallons's relatively short existence and compared to awards in similar defamation cases." The court rejected the defendants' renewed argument that the plaintiff's experts should not have been allowed to testify. And finally, the court denied the motion for remittitur because it was inappropriate given that "the jury was not asked to separately identify what amount it was awarding for reputational harm, lost profits, or other monetary loss."

USB filed this appeal on March 2, 2012, challenging (1) the jury's finding of defamation and (2) its award of $4 million in damages.

II

USB contends that on the defamation finding, it is entitled to judgment as a matter of law because its desk statements issued in response to MyGallons' June 30 press release were substantially true and any resulting "sting" was caused by the true statement that MyGallons did not have a contract with USB. In response, MyGallons contends that having no contract was not the entire message of the desk statements and that when the statements are considered as a whole, they communicated the false impression that there had not been any contact or

12

association between the companies. Thus, MyGallons contends that there was sufficient evidence from which the jury could have concluded that one or more of the statements in the desk statements were false.

We review the district court's denial of the motion for judgment as a matter of law de novo. See Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999). And in conducting our review, we take the evidence in the light most favorable to MyGallons and draw all reasonable inferences in its favor. See id.

The parties agree that the defamation claim is governed by Minnesota law because the alleged defamation originated in Minnesota. They also agree that under Minnesota law, the elements of a defamation claim are: "(1) the defamatory statement was communicated to someone other than the plaintiff; (2) the statement is false; (3) the statement tends to harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community; and (4) the recipient of the false statement reasonably understands it to refer to a specific individual." McKee v. Laurion, 825 N.W.2d 725, 729-30 (Minn. 2013) (alteration in original) (internal quotation marks and citations omitted). A defamation claim cannot be based on a true statement. Id. at 730. "True statements" include statements that are "true in substance" and contain only "minor

13

inaccuracies of expression or detail." Id. In articulating this standard, the Minnesota courts explain that "substantial truth" means that "the substance, the gist, the sting, of the libelous charge [is] justified" and the statement "would have the same effect on the mind of the reader or listener as that which the pleaded truth would have produced." Id. (alteration in original) (emphasis added) (internal quotation marks omitted). Finally, the determination of truth or falsity is generally a question for the jury. Id.

In this case, USB's desk statements contain four significant statements: (1) USB "does not have a contract to do business with MyGallons.com"; (2) USB "did not authorize the use of its name in association with this venture"; (3) USB is "not affiliated with this company"; (4) "there are no ongoing negotiations to enter into any agreement with MyGallons."

The jury determined, by implication, that the first statement was true because it found against MyGallons on its breach of contract claim. But, in concluding that USB had defamed MyGallons, it found necessarily that one of the other statements or the statements "as a whole" were false. See Jadwin v. Minneapolis Star & Tribune Co., 390 N.W.2d 437, 443 (Minn. Ct. App. 1986).

Even though USB's statement that it did not have a contract with MyGallons was true, the remaining statements fairly

14

communicated a total disassociation of the companies. USB used language to suggest that there had been nothing ongoing between the parties, stating that it "did not authorize the use of its name" in connection with MyGallons' venture; that it was "not affiliated" with MyGallons; and that "there were no ongoing negotiations." Yet, the evidence showed that USB executives had heard from Verona about his concept for MyGallons, had met with MyGallons, and had indeed directed MyGallons to establish a pilot program though GoGas. While there may have been some confusion about whether the proposed business relationship was to be a commercial one or consumer oriented, it cannot be said that the parties had not been negotiating or that they had no relationship. USB employees had been working with GoGas and Verona to design fleet cards that used the logos of both MyGallons and Voyager, and there was evidence that USB was, as of June 27, 2008, a few days before MyGallons issued its press release, in the process of drafting a contract to implement a direct relationship between it and MyGallons. The suggestions that there had been no contact between the parties implied that what MyGallons had reported publicly in its press release was a complete fabrication, leading public commentators to refer to MyGallons as a fraud or a sham. While MyGallons may have jumped the gun with its announcement on June 30, 2008, USB's response was an overreaction that the jury could conclude gave a false

description of the relationship. We conclude that a jury could reasonably have found that one or more of the statements contained in USB's desk statements were false, thus satisfying that essential element of a defamation claim.

USB contends that even if one of the statements was false, any "sting" was caused by the true statement that MyGallons did not have a contract with USB for a nationwide consumer program. USB, however, does not present evidence to support this argument, and it does not explain why we should reject the jury's conclusion that the sting was caused by the falsity of one or more of the other statements or the message communicated by the other statements taken "as a whole."

Accordingly, we conclude that the district court did not err in refusing to set aside the verdict on the ground that there was no substantial evidence to support the verdict.

III

USB also contends that the jury's award of $4 million in damages was excessive and unsupportable. It argues that a $4 million award "for general damages alone would be excessive, [so] the verdict cannot be upheld unless it is deemed to be comprised, at least in part, of special damages." And with respect to special damages, it argues that MyGallons failed to prove the requisite causation. Alternatively, it argues that

16

the special damages award was unsupported, inasmuch as "MyGallons should not have been allowed to present expert testimony seeking $208 million in lost profits" when the company had just started up and had no financing or profits.

In defense of the award, MyGallons contends that (1) that "the jury's lump sum award for all damages [must be] presumed to be a mix of general and special damages in the proportion most favorable to MyGallons"; (2) that there was sufficient evidence of causation for special damages; (3) that even if the award was entirely for general damages, it would not have been excessive; and (4) that the expert testimony was properly admitted in the discretion of the trial judge.

Under Minnesota law, damage awards in defamation cases can be for (1) general damages for harm to reputation, wounded feelings, and humiliation; or (2) special damages for "the loss of something having economic or pecuniary value." Longbehn v. Schoenrock, 727 N.W.2d 153, 160 (Minn. Ct. App. 2007) (quoting Restatement (Second) of Torts § 575 cmt. b (1977)); see also Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 258-59 (Minn. 1980). Moreover, Minnesota courts have concluded that "corporate plaintiffs stand on the same footing as individuals in defamation actions." Advanced Training Sys., Inc. v. Caswell Equip. Co., 352 N.W.2d 1, 10 (Minn. 1984). Consequently, corporations may not only receive awards for special damages in

17

defamation cases, but also for general damages for reputational harm. See, e.g., Imperial Developers, Inc. v. Seaboard Sur. Co., 518 N.W.2d 623, 627 (Minn. Ct. App. 1994).

In this case, the jury returned a general verdict awarding MyGallons $4 million in damages for defamation without specifying whether the $4 million was for general or special damages, or both.

We begin our inquiry by assuming first, for purposes of analysis, that the jury award was only for general damages based on reputational injury. On that assumption, we agree with USB that the award would have been excessive because a $4 million award for reputational harm to a startup company that had only publicly launched its business a few days before the defamation would be "so exorbitant as to shock the sense of the court." Scott Fetzer Co. v. Williamson, 101 F.3d 549, 555 (8th Cir. 1996) (applying that standard to defamation damages under Minnesota law). Even though MyGallons did receive extensive media attention with its startup announcement on June 30, 2008, and some 30,000 individuals enrolled or attempted to enroll in the program shortly thereafter, it was a nascent company with no capital, no financing, no customers who had yet used its planned consumer program, and no profit. Any public reputation, therefore, was established only in the few days extending from June 30, 2008, into early July 2008. We find no support in the

18

record or in the case law that a company in those circumstances would be entitled to millions of dollars in reputational damage. We therefore conclude that if the award were entirely for general damages, it would have been excessive.

Because the award fails if based completely on general damages, we will assume, as we must, that the award included at least some special damages, thus presenting the issues raised by USB about any award of special damages. USB argues that any special damages award could not stand because the plaintiffs failed to prove causation and, in any event, were able to justify such an award only with inadmissible expert testimony.

Under Minnesota law, special damages are recoverable only for "actual and special pecuniary loss." Stuempges, 297 N.W.2d at 258. To recover such damages, a plaintiff must show (1) the "loss of something having economic or pecuniary value" and (2) sufficient causation -- that the defamatory statement was a "substantial factor in bringing about the harm." Longbehn, 727 N.W.2d at 160 (internal quotation marks omitted).

In support of its argument that the plaintiffs failed to prove causation, USB points to the facts (1) that MyGallons failed to call any of the "potential replacement [payment] processors" as witnesses; (2) that Melody Wigdahl, an independent contractor retained by MyGallons to help find an alternative payment processor, identified other factors as the

19

impediments to MyGallons' securing an alternative payment network; and (3) that Verona could not testify as to the influence of the defamation on the alternative payment processors because the district court sustained objections to that line of questioning as hearsay and without foundation.

Even so, we conclude that there was sufficient evidence from which a jury could have found causation. The desk statements issued by USB ignited a wave of bad press for MyGallons, with MyGallons labeled as a "fraud" and a "scam." Verona testified that although there were alternative payment networks and that he believed that securing another network "wasn't going to be that much of a challenge . . . with Wright Express which is Voyager's biggest competitor or with Comdata and MasterCard or Visa or another payment network," every network refused to work with MyGallons and that he "couldn't even name all of the companies that didn't have meetings with [us] that just turned us down immediately." He further testified that alternative payment processors would ask about "the series of events that led up to us calling them." Verona concluded that "it was apparent that we weren't going to be able to get anywhere as long as we had all of this press directed at us and [were] being portrayed as a fraud."

The evidence showed further that Wigdahl had sent an email to MyGallons during the period following the defamation stating

20

that "unfortunately, the negative information online is being brought up in every call back so far. . . . What would you suggest as a response to the negative information available online about MyGallons?" In addition, Wigdahl testified that, as to Sutton Bank, a potential payment processor, "the issue [was] the fact that U.S.B. had cancelled the program."

From this evidence, we conclude that a reasonable jury could draw reasonable inferences of causation. See, e.g., DeJarnette v. Corning, Inc., 133 F.3d 293, 297 (4th Cir. 1998) (noting that juries can draw "reasonably probable" inferences to establish causation); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) ("[T]he question of sufficiency goes simply to the reasonableness of drawing the necessary inference of causation from the indirect evidence"); Stuempges, 297 N.W.2d at 259 (finding that it was reasonable for a jury to find that the plaintiff's inability to find employment was caused by a supervisor's poor recommendation).

We agree, however, with USB that any award of special damages was influenced by the expert testimony of a witness improperly allowed to testify, in violation of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). To provide evidence of lost profits, MyGallons used the testimony of two expert witnesses, Dr. Anca Micu, a professor of marketing, and Paul Seitz, a certified public accountant. Dr.

21

Micu projected that over a three-year period beginning July 1, 2008, Mygallons could have achieved about 3.3 million members "if they would have been in business as planned." Based on that projected membership, Seitz estimated that MyGallons suffered $208 million in lost profits. USB argues that because Dr. Micu lacked experience in forecasting sales and used an overly optimistic and flawed method to predict membership, she should not have been allowed to give her opinions.

Dr. Micu's experience was centered on marketing effectiveness. She had a Ph.D. in strategic communications, an MBA in marketing, and a BS in finance and was a professor of marketing at Sacred Heart University, where she taught courses in advertising, marketing research, digital marketing, and consumer behavior. She acknowledged, however, that her expertise was not in sales forecasting and that "sales [are] not used as an effectiveness measure of advertising efforts or spending." Nonetheless, she claimed that she was qualified to give her opinions based on her expertise in "communication effectiveness or persuasion with purchase intent."

To project the future membership of MyGallons and therefore its profits, Dr. Micu employed a "funnel approach." Under this approach she began with the market's overall size and then narrowed it to an estimate of actual memberships by considering those who were aware of the MyGallons brand, the traffic to its

site, actual signups, and a projected growth rate and attrition. She benchmarked MyGallons' growth against industry giants such as Apple, Costco, Netflix, and eHarmony, and she did not reference any startup companies. In using the experience of those large, successful companies as benchmarks, Dr. Micu did not consider whether MyGallons had the resources, financing, or experience necessary for such growth or, indeed, even as necessary to carryout its own business plan. She also did not consider the real circumstances that could cause MyGallons' business plan to fail. For instance, Dr. Micu did not take into account the viability of MyGallons' plan <u>if gas prices dropped</u>, a puzzling omission given the fact that gas prices actually fell in the months after MyGallons announced its business plan. Of course, with falling gas prices, the whole purpose of MyGallons' gas payment plan would be defeated, as it was designed to hedge against rising gas prices.

In sum, we conclude that far from resting on the requisite "reliable foundation" that was required for such testimony, Dr. Micu's projections ignored business realities and relied on sheer speculation. We therefore conclude that the district court abused its discretion in admitting Dr. Micu's testimony under the standards required by both Federal Rule of Evidence 702 and <u>Daubert</u>.

Without Dr. Micu's projected membership, Seitz had no basis for his estimate that MyGallons suffered $208 million in damages. And without this figure, we find no basis in the record from which a jury could conclude that, as a startup company without prior experience in consumer hedging and with only days of publicity, MyGallons sustained a loss justifying a substantial special damages award. See Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) ("Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future . . . prospects"); Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 142-43 (4th Cir. 1994) (concluding that baseless expert testimony should not have been admitted).

In sum, we conclude that a $4 million award would have been excessive if entered for only general damages and that a $4 million award of special damages or some combination of general and special damages would have been unsupported by admissible evidence. Accordingly, we vacate the award of damages and remand for a new trial on damages.

For the reasons given, the judgment of the district court is

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.

24