**PUBLISHED**

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**No. 20-1329**

FREDRIC N. ESHELMAN,

        Plaintiff – Appellee,

  v.

PUMA BIOTECHNOLOGY, INC.,

        Defendant – Appellant,

  and

ALAN H. AUERBACH,

        Defendant.

**No. 20-1376**

FREDRIC N. ESHELMAN,

        Plaintiff – Appellant,

  v.

PUMA BIOTECHNOLOGY, INC.,

        Defendant – Appellee,

  and

ALAN H. AUERBACH,

        Defendant.

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington.  James C. Dever, III, District Judge.  (7:16-cv-00018-D)

Argued:  May 4, 2021                                          Decided:  June 23, 2021

Before GREGORY, Chief Judge, and MOTZ and THACKER, Circuit Judges.

Affirmed in part, vacated in part, and remanded for further proceedings by published opinion.  Judge Motz wrote the opinion, in which Chief Judge Gregory and Judge Thacker joined.

**ARGUED:**  Roman Martinez, LATHAM & WATKINS LLP, Washington, D.C., for Appellant/Cross-Appellee.  Elizabeth Marie Locke, CLARE LOCKE LLP, Alexandria, Virginia, for Appellee/Cross-Appellant.  **ON BRIEF:**  Charles S. Dameron, Margaret A. Upshaw, LATHAM & WATKINS LLP, Washington, D.C., for Appellant/Cross-Appellee. Joseph R. Oliveri, CLARE LOCKE LLP, Alexandria, Virginia, for Appellee/Cross-Appellant.

DIANA GRIBBON MOTZ, Circuit Judge:

In 2019, a jury found Puma Biotechnology, Inc. had defamed Fredric Eshelman and ordered Puma to pay Eshelman $22.35 million in compensatory and punitive damages. This verdict constituted the largest damages award in a defamation suit in North Carolina history. Puma appeals, challenging the jury verdict on a number of grounds, including excessiveness. For the reasons that follow, we affirm the liability verdict but vacate the damages award and remand the case to the district court for further proceedings consistent with this opinion.

I.

This lawsuit arises from an investor presentation created by Puma, a pharmaceutical company, in the midst of a proxy contest with Eshelman, a Puma shareholder. Eshelman is also the founder of Pharmaceutical Product Development ("PPD"), another pharmaceutical company. In 2015 and 2016, Eshelman attempted to take over the Puma board through a proxy contest.

In response, Puma invited its shareholders to visit a link on its investor-relations website where it had published an investor presentation. The presentation discussed events from a decade earlier; specifically, that PPD had contracted with another pharmaceutical company to determine the safety and effectiveness of the drug Ketek. During the Ketek clinical trials, which occurred while Eshelman was CEO of PPD, a clinical investigator falsified documents. According to Eshelman, and later the jury, he was not involved in the fraud. To the contrary, an FDA Special Agent testified that PPD reported the fraud.

3

The Puma presentation, however, indicated that Eshelman had been culpably involved in the Ketek clinical-trial fraud. Three slides in the presentation were titled "Eshelman Continues to Demonstrate a Lack of Integrity." One of those slides stated that "[a]s [CEO] of PPD, Eshelman was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008," and that "Eshelman was replaced as CEO for PPD in 2009." Another slide stated that "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company; particularly a company that is in the process of seeking FDA approval."

Visitors to Puma's website viewed the page where the presentation was published at least 198 times. Puma also filed the presentation with the SEC, which made it permanently accessible on its website.

Eshelman, a resident of North Carolina, initiated this diversity action. He alleges state-law claims of defamation against Puma, which is incorporated in Delaware and has its principal place of business in California, and Alan Auerbach, Puma's CEO, who resides in California. Puma moved to dismiss the suit for lack of personal jurisdiction; the district court denied the motion.

Following cross-motions for summary judgment, the court held that two of Puma's statements were defamatory *per se*: (1) "Puma's statement that [Eshelman] was 'involved in clinical trial fraud,'" and (2) "Puma's statement that [Eshelman] was 'replaced as CEO of PPD in 2009 after being forced to testify regarding fraud in 2008.'" The case proceeded to a jury trial to determine whether Puma's statements were false and made with actual

4

malice, and if so, the amount of damages to be awarded to Eshelman. The jury returned a verdict for Eshelman and awarded him $15.85 million in compensatory damages and $6.5 million in punitive damages.

Puma moved for a new trial or remittitur and Eshelman moved for attorneys' fees. The district court denied all motions, and the parties now appeal.

## II.

Puma first challenges the district court's denial of Puma's motion to dismiss for lack of personal jurisdiction. We review *de novo*. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 (4th Cir. 2009).

Puma has waived its personal jurisdiction claim. In a pretrial order, the parties stipulated to jurisdiction, agreeing that "[t]he Court has jurisdiction of the parties," and "[a]ll parties are properly before the Court."

In *Petrowski v. Hawkeye-Sec. Ins. Co.*, the Supreme Court considered a similar claim. 350 U.S. 495 (1956) (per curiam). The *Petrowski* defendant had specifically stipulated that it "voluntarily submits to the jurisdiction of the . . . court," *id.* at 496, but after a trial on the merits, it contested personal jurisdiction. The Supreme Court rejected the defendant's attempt to roll back its stipulation, concluding that it had, "by its stipulation, waived any right to assert a lack of personal jurisdiction." *Id.*

So too here: Puma cannot now dispute that to which it has already agreed.

5

III.

Puma next argues that it is entitled to a new trial on liability for two reasons. First, it contends that the district court erred in its summary judgment determination that the two investor presentation statements were defamatory *per se*. Second, it argues that the verdict form prejudicially misrepresented those statements. We reject both claims.

A.

At summary judgment, the district court determined that two statements from the investor presentation were defamatory *per se*: "(1) Puma's statement that [Eshelman] was 'involved in clinical trial fraud,' and (2) Puma's statement that [Eshelman] was 'replaced as CEO of PPD in 2009 after being forced to testify regarding fraud in 2008.'"[1]

We review *de novo*, *Miller v. FDIC*, 906 F.2d 972, 974 (4th Cir. 1990), and because we sit in diversity, we apply North Carolina substantive law, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–80 (1938). In North Carolina, "[w]hether a publication is libelous *per se*

---

[1] Eshelman argues that Puma has failed to preserve this issue for our consideration because Puma seeks review of the district court's denial of summary judgment after a full trial and final judgment. Such orders generally are not appealable. *See Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 422 (4th Cir. 2005). However, Puma and Eshelman filed cross-motions for summary judgment on the same issue. That is, Puma argued that its statements were not defamatory and Eshelman argued that they were not only defamatory, but defamatory *per se*. Thus, when the district court ruled in favor of Eshelman, it denied Puma's motion, but it also granted in part Eshelman's motion. And when "appeal from a denial of summary judgment is raised in tandem with an appeal of an order granting a cross-motion for summary judgment, we have jurisdiction to review" that denial. *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996) (citing *Sacred Heart Med. Ctr. v. Sullivan*, 958 F.2d 537, 543 (3d Cir. 1992)).

is a question of law for the court." *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 899 (N.C. Ct. App. 2002).

To resolve this question, a court begins by asking if each of the statements is "subject to only one interpretation" "when considered alone without innuendo, colloquium or explanatory circumstances" by "ordinary people." *Renwick v. News & Observer Publ'g Co.*, 312 S.E.2d 405, 409–10 (N.C. 1984).

Puma argues that both statements are capable of more than one interpretation. Puma notes that its statement that Eshelman was "*involved in* clinical trial fraud" does not explicitly claim that he "*committed* trial fraud." For this reason, Puma contends the statement could be interpreted to say that Eshelman was an innocent bystander and not culpable of the fraud. Similarly, Puma argues that the statement that Eshelman was "replaced as CEO of PPD" cannot be defamatory *per se* because it does not say Eshelman was fired; it only says he was "replaced."

But this is not how an ordinary person would "naturally understand" the presentation. *Flake v. Greensboro News Co.*, 195 S.E. 55, 60 (N.C. 1938). The three slides at issue are entitled "Eshelman Continues to Demonstrate a Lack of Integrity." The second slide states that Eshelman was CEO of PPD during the Ketek clinical trial, and that "[f]raud was uncovered in this trial by the FDA's Office of Criminal Investigation." The next four bullet points explain various aspects of the fraud. The slide next states that "Eshelman was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2009." The slide ends with a sub-bullet point stating that "Eshelman was replaced as CEO of PPD in 2009." With no "explanatory circumstances," *Renwick*, 312 S.E.2d at 408–

7

09, the ordinary reader would presume that Eshelman was removed as CEO due to the fraud.

On the third slide, Puma asserts that a PPD associate "sent evidence of fraud to PPD management, which was ignored." The slide then states that "Eshelman denied before Congress that fraud had occurred," links to Eshelman's congressional testimony, and concludes with a statement that "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company." In this "context," *Boyce & Isley, PLLC*, 568 S.E.2d at 897, the presentation is susceptible to only one reasonable interpretation: that Eshelman's "involvement in clinical trial fraud" was sinister.

Each statement is thus capable of a singular interpretation. Under well-established North Carolina law, we next inquire if that interpretation "(1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace." *Renwick*, 312 S.E.2d at 408–09 (citing *Flake*, 195 S.E. at 60). We have little trouble concluding that the statements at issue — at a minimum — impeach Eshelman in his profession. *See Badame v. Lampke*, 89 S.E.2d 466, 468 (N.C. 1955) (statement that plaintiff engaged in "shady deals" was defamatory *per se*); *Clark v. Brown*, 393 S.E.2d 134, 137 (N.C. 1990) (statement that plaintiff was fired for being incompetent was libel *per se*).

Thus, because the investor presentation statements were susceptible of only one reasonable interpretation, and that interpretation was defamatory, we affirm the district court's determination that the statements were defamatory *per se*.

B.

Puma also contends that asserted errors in the verdict form warrant a new trial. We "holistically" review a verdict form for abuse of discretion. *Benjamin v. Sparks*, 986 F.3d 332, 346–47 (4th Cir. 2021). We must evaluate "whether the form 'adequately presented the contested issues to the jury when read as a whole and in conjunction with the general charge, whether submission of the issues to the jury was fair, and whether the ultimate questions of fact were clearly submitted to the jury.'" *Id.* (quoting *Horne v. Owens Corning Fiberglas Corp.*, 4 F.3d 276, 284 (4th Cir. 1993)).

Puma asserts two errors; both arise from the instruction that the jury determine whether Puma's statements that "Eshelman was 'replaced as CEO of PPD' after being 'involved in clinical trial fraud'" were false and made with actual malice. First, Puma contends that the district court erred in inserting "after being" between the quoted material. Second, Puma argues that the district court never determined that the statement "Eshelman was 'replaced as CEO of PPD' after being 'involved in clinical trial fraud'" was defamatory *per se* because at summary judgment it had separately analyzed the statements "Eshelman was 'replaced as CEO of PPD in 2009 after being forced to testify regarding fraud in 2008'" and "Eshelman was 'involved in clinical trial fraud.'"

These quibbles do not render the verdict form unclear or the verdict unfair. The district court carefully delineated between Puma's statements and the court's summary by

9

its use of quotation marks. Moreover, the jury received a copy of the investor presentation and was properly instructed to consider the quoted statements "in the context of the entire presentation." Accordingly, when "read as a whole," the verdict form "adequately presented" Puma's statements to the jury. *Horne*, 4 F.3d at 284. Thus, we reject Puma's challenge to the verdict form.

IV.

We now reach the crux of this appeal: Puma's contention that the jury award was excessive and that the district court erred in denying its motion for a new trial or remittitur.[2]

We review for abuse of discretion, *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 334 (4th Cir. 2013), and apply "state law standards," *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435– 39 (1996)). Rule 59(a) of the North Carolina Rules of Civil Procedure permits a new trial for "[m]anifest disregard by the jury of the instructions of the court," "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice," or "[i]nsufficiency of the evidence to justify the verdict or that the verdict is contrary to law." N.C. Gen. Stat. § 1A-1, Rule 59(a)(5)–(7). Here, in manifest disregard

---

[2] Eshelman argues that Puma waived its damages arguments when it failed to move for judgment as a matter of law. But that Rule 50 requirement applies to challenges to the sufficiency of the evidence, not to Rule 59 motions alleging an excessive damages verdict. *See Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 160–61 (4th Cir. 2012).

of the jury instructions, the jury awarded excessive damages that the evidence could not justify.

We start with the observation that the jury's $22.35 million award — $15.85 million for compensatory damages and $6.5 million for punitive damages — is exceptionally large. No North Carolina jury has awarded anything close to such an amount in a defamation case. The next highest jury awards that have been upheld on appeal are an order of magnitude lower. *See Hien Nguyen v. Taylor*, 723 S.E.2d 551, 556 (N.C. Ct. App. 2012) (upholding $1 million in compensatory damages per plaintiff); *see also Desmond v. News & Observer Publ'g Co.*, 846 S.E.2d 647 (N.C. Ct. App. 2020) (affirming judgment of $1.5 million in compensatory damages). One would expect ample evidence of the harm suffered by Eshelman to support a jury award ten times the size of the largest defamation awards in North Carolina history.

But there is no evidence justifying such an enormous award. Eshelman estimated that his damages were $7.5 million before trial, $100 million at his deposition, and $52 million at closing argument. Yet he provided no support for any of these very different and fluctuating estimates.

Although Eshelman testified on his own behalf that he suffered "incalculable" damage to his reputation, when asked for support for that assertion, he said he did not "have any idea" about "any kind of financial or economic harm [he suffered] as a result of these

11

statements." He also was unable to name any person who refused to do business with him, or any person who had knowledge of damage to his reputation.

Eshelman offered testimony from only one person who had read the presentation: his friend, Kenneth Lee. Lee testified not only that he did not believe that Eshelman committed fraud, but also that Eshelman had a "very generous [public] persona" and remained a "leader in the industry" after the publication of the defamatory statements. In sum, neither Eshelman nor his witness identified any lost business opportunities, damaged relationships, or foregone contracts resulting from the investor presentation.

Moreover, Puma presented evidence that after publication of the presentation, Eshelman continued to serve on boards of at least seven companies, and that he received numerous accolades in the following years. These accolades included "CEO of the Year" from the Council on Entrepreneurial Development, a Star News Lifetime Achievement Award, an honorary degree, and induction into the North Carolina Business Hall of Fame. The record thus indicates that Eshelman's reputation remained both commendable and intact after the publication.

North Carolina law "presumes that general damages actually, proximately, and necessarily result" from defamation *per se*. *Flake*, 195 S.E. at 59. The doctrine of presumed damages means that "no proof is required" to support the precise amount of a damages award. *Id*. But, nevertheless, the North Carolina pattern jury instructions for libel make clear that a plaintiff must demonstrate that the award it seeks "is a direct and natural consequence of the libel." N.C.P.I.—Civ. 806.83. *See also Hien Nguyen*, 723 S.E.2d at 559 (the "party seeking damages must show that the amount of damages is based upon a

12

standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty"); *Mann v. Swiggett*, 2012 WL 5507255, at \*4 (E.D.N.C. Oct. 9, 2012).

Here the jurors could not have calculated the $22.35 million in damages with the requisite level of certainty because they received no evidence sufficient to support a multi-million-dollar damages award. The district court properly instructed the jury as to presumed damages. Consistent with North Carolina pattern jury instructions, the court told the jurors that presumed damages "unavoidably include[] an element of speculation." *Eshelman v. Puma Biotechnology, Inc.*, No. 2:16-CV-00018-D, Dkt. 286 at 21–22; *see also* N.C.P.I.—Civ. 806.83. However, the court also instructed the jury that it was nonetheless required to evaluate "the probable extent of actual harm in the form of loss of reputation or standing in the community, mental or physical pain and suffering, . . . inconvenience or loss of enjoyment which [Eshelman] has suffered or will suffer in the future as a result of the [Puma's] publication of the libelous statements." *Id*. Finally, the court instructed the jury that it must award the plaintiff an amount that "is a direct and natural consequence of the libel of [Eshelman] by [Puma]." *Id*.

A jury cannot faithfully complete this task when there is no evidence whatsoever of actual harm sufficient to support the damages award. *See MyGallons LLC v. U.S. Bancorp*, 521 F. App'x 297, 305 (4th Cir. 2013) ($4 million general damages verdict for defamation *per se* would be "excessive" because it had "no support in the record"); *see also Fontenot*, 736 F.3d at 334–35 (jury award amounted to "pure conjecture" because plaintiff provided no supporting evidence).

13

Eshelman relies on a number of defamation cases where larger jury awards were approved. *See, e.g.*, *Cantu v. Flanigan*, 705 F. Supp. 2d 220 (E.D.N.Y. 2010) ($150 million compensatory damages award); *Anagnost v. The Mortg. Specialists, Inc.*, No. 2162016cv00277, 2017 WL 7690898 (N.H. Super. Ct. Sept. 29, 2017) ($105 million compensatory damages award), *aff'd*, 2018 WL 4940850 (N.H. Sept. 25, 2018); *Wynn v. Francis*, No. B245401, 2014 WL 2811692, at *1 (Cal. Ct. App. June 23, 2014) ($17 million presumed damages award). But these out-of-state awards are inapposite. All involved defamatory statements published in widely circulated newspapers, on billboards, on television, or on popular websites. At trial, Eshelman failed to demonstrate similar widespread publication.

The trial record shows that the website linking to the investor presentation at issue here was viewed only 198 times. The Puma presentation is permanently available on the SEC website, but Eshelman has made no attempt to quantify the number of people who have viewed, or will view, it there. And if many people had seen the presentation on the SEC website, we would expect to see some evidence of its effect on Eshelman's reputation.

Where North Carolina courts have awarded million-dollar damages awards for defamation, there has been little doubt that the defamatory statements were widely publicized. *See Desmond v. News & Observer Publ'g Co.*, 823 S.E.2d 412, 438 (N.C. Ct. App. 2018) ($1.6 million in compensatory damages for two defamatory articles published in major regional newspaper stating plaintiff had falsified evidence and committed perjury); *Hien Nguyen*, 723 S.E.2d at 556 ($1 million in compensatory damages per

14

plaintiff for a DVD that falsely showed plaintiffs conducting a wrongful and racially-motivated arrest; the video profited $40 million for the defendant).

Moreover, the defamation cases in North Carolina yielding far lower damages awards involve statements which, at least on their face, seem considerably more harmful than those here. For example, in *Lacey v. Kirk*, the jury awarded $50,000 in compensatory damages for statements by the defendant that the plaintiff had committed murder. 767 S.E.2d 632, 648 (N.C. Ct. App. 2014). And in *Kroh v. Kroh*, the plaintiff accused the defendant of molesting his children as well as the family dog; the defendant was awarded $20,000 in compensatory damages. 567 S.E.2d 760, 762 (N.C. Ct. App. 2002).

Eshelman has failed to offer evidence of widespread circulation or comparable harm as a "direct and natural consequence[s] of the libel." *MyGallons LLC*, 521 F. App'x at 305. Accordingly, the district court abused its discretion in failing to grant Puma's motion for a remittitur or new trial.

V.

We now turn to the remedy. When an appellate court concludes that a jury's damages award is excessive, "it is the court's duty to require a remittitur or order a new trial." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

Because the Seventh Amendment preserves for the plaintiff his jury right, "the preferable course, upon identifying a jury's award as excessive, is to grant a new trial *nisi remittitur*, which gives the plaintiff the option of accepting the remittitur or of submitting to a new trial." *Id.*; *see also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

15

Federal Practice and Procedure § 2820 (2d ed. 1995). In determining the appropriate amount for remittitur, a court looks to "the outermost award that could be sustained." *Konkel*, 165 F.3d at 282. This course of action thus has the practical advantage of notifying the parties of the upper limit of damages that will withstand scrutiny, while comporting with the Seventh Amendment. *See Kennon v. Gilmer*, 131 U.S. 22 (1889); *see also Defender Indus. v. Nw. Mut. Life Ins. Co.*, 938 F.2d 502 (4th Cir. 1991) (en banc).

However, "our options in remedying an excessive verdict are not unlimited," *Cline*, 144 F.3d at 305 n.2, and identifying the outermost award that can be sustained presents considerable difficulty in this case. For the reasons explained above, we find no evidence to support the amount awarded by the jury. By the same token, we cannot ourselves determine with the requisite level of certainty what amount may compensate Eshelman for the defamatory statements. And under North Carolina law, punitive damages depend in part on compensatory damages, N.C. Gen. Stat. § 1D-35(2), so we also cannot identify an appropriate remitted punitive damages award. Thus, while ordering a new trial *nisi remittitur* is an "option," *Cline*, 144 F.3d at 305 n.2, it is an option we reject in this case. *See Knussman v. Maryland*, 272 F.3d 625, 642 (4th Cir. 2001); *see also Kennon*, 131 U.S. at 29.

Instead, we vacate the compensatory and punitive damages awards and remand the case to the district court for a new trial on damages.[3]

## VI.

In sum, we affirm the liability judgment of the district court, vacate the damages award, and remand for a new trial on damages.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED FOR FURTHER PROCEEDINGS*

---

[3] As a result of our decision to remand this case for a new trial, "the basis for the district court's denial of attorney fees no longer exists." *Sasaki v. Class*, 92 F.3d 232, 243 (4th Cir. 1996). Accordingly, we do not address Eshelman's cross-appeal challenging denial of attorneys' fees.

Because we order a new trial, we do resolve his conditional cross-appeals. Eshelman first argues that the district court erred in determining that a crudely worded email from Auerbach to his attorneys was privileged attorney-client information. Reviewing for abuse of discretion, *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 349 (4th Cir. 2014), we reject this claim. For the reasons stated by the district court, the e-mail constituted a privileged communication under North Carolina law. Eshelman next argues that the district court should have nevertheless allowed him to publish parts of the email to the jury. But, because the district court correctly determined that the email is privileged in its entirety, it is not admissible evidence, even for the purposes of impeachment. *State v. Lowery*, 723 S.E.2d 358, 363 (N.C. Ct. App. 2012). Accordingly, we reject Eshelman's conditional cross-appeals.