Jekson USA, Inc. v. White, 2026 NCBC 25.

STATE OF NORTH CAROLINA

FRANKLIN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV001391-340

JEKSON USA, INC.,

Plaintiff,

v.

JAMES EDWARD WHITE,

Defendant.

**ORDER AND OPINION ON
PLAINTIFF'S MOTION TO DISMISS
COUNTERCLAIMS**

**THIS MATTER** is before the Court on Plaintiff Jekson USA, Inc.'s Motion to Dismiss Counterclaims ("Motion to Dismiss" or "Motion," ECF No. 32). Having considered the Motion to Dismiss, the parties' briefs, the arguments of counsel, the applicable law, and all other appropriate matters of record, the Court concludes that the Motion to Dismiss should be **GRANTED in part** and **DENIED in part** for the reasons set forth below.

> *Nelson Mullins Riley & Scarborough, LLP, by Matthew Joseph Gorga, Nathaniel Pencook, and Phillip J. Strach, for Plaintiff.*

> *Ayers & Haidt, P.A., by Jack Ayers and James M. Ayers, for Defendant.*

Davis, Judge.

## INTRODUCTION

1. James Edward White was employed by Jekson USA, Inc. ("Jekson") as a mechanical engineer for almost five years. In 2024, he resigned and started a new company. Jekson subsequently brought this lawsuit, asserting that he breached his

employment contract with Jekson and misappropriated its trade secrets to directly compete with Jekson through his new company. In response, White has asserted various counterclaims, alleging that it was, in fact, Jekson who breached its employment contract with him and committed several tortious acts against him. In the present Motion to Dismiss, Jekson seeks dismissal of these counterclaims.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the counterclaims (and the documents attached to the counterclaims or referred to therein) that are relevant to the Court's determination of the motion. *See, e.g., Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

3. White, a resident of Youngsville, North Carolina, is a mechanical engineer with more than thirty-five years of experience "designing automated sorting, feeding, inspection, track and trace, and various other kinds of solutions for manufacturing applications, in a variety of sectors, but particularly for the pharmaceutical sector." (Countercls., ECF No. 24, ¶¶ 4, 33.)

4. Jekson is a wholly owned subsidiary of Jekson Vision, a company based in India and controlled by Rishal Shah. (Countercls. ¶ 12.)

5. In January 2020, Jekson offered White employment with a compensation package of "$150,000 base salary, a $400 monthly car stipend, a $1,200 yearly car

maintenance stipend, health insurance coverage for his entire family, and reimbursement for the use of his personal cell phone." (Countercls. ¶ 20.)

6. White began working for Jekson on 27 January 2020. (Countercls. ¶ 23.) He was not required to sign a written employment agreement at the time of his hiring. (Countercls. ¶ 21.)

7. On or about 18 February 2020, White was presented with a written employment agreement and asked to sign it. (Countercls. ¶ 24.) White "delivered a partially executed copy of the . . . Employment Agreement" to a Jekson employee on or about 25 February 2020. (Countercls. ¶ 25.)

8. White alleges that the employment agreement contained certain restrictive covenants (including a non-competition provision) that were not part of the original terms of employment under which he was hired. (Countercls. ¶¶ 29, 201–02.)

9. White asserts that throughout his employment, Jekson would periodically pay him less than his agreed-upon salary and promise to pay him the withheld amounts at a later date, but never actually did so. (Countercls. ¶¶ 147, 160, 164–66, 182–83, 185.)

10. White attempted to negotiate an "update to the terms of his employment in September of 2024, as he believed that he was being undervalued and it was time for Jekson to catch up on the promises it had made when [he] joined Jekson." (Countercls. ¶ 91.) Those negotiations led Jekson to propose a new employment agreement, which included a commission structure for White. White, however, refused to sign the new employment agreement. (Countercls. ¶¶ 92–94.)

11.    White ultimately resigned his position with Jekson on 21 September 2024. (Countercls. ¶ 98.)

12.    After his resignation from Jekson, White formed a new company, Innovative Design Solutions, LLC ("IDS"). (Countercls. ¶¶ 116–17.)

13.    White alleges that since his resignation, he has periodically received calls from Jekson's creditors regarding its unpaid bills because he remains listed as the Chief Technology Officer on Jekson's filings with the North Carolina Secretary of State's Office. White further contends that he continued to be identified by Jekson as its registered agent for some period of time after his resignation. (Countercls. ¶¶ 140–41, 228–32, 234–37.)

14.    White also asserts that Jekson obtained credit cards in his name without his knowledge or consent—to which he has no access. He further asserts that Jekson has run up debts on these credit cards, rendering him potentially liable for their repayment. (Countercls. ¶¶ 238–39, 243–48.)

15.    On 21 July 2025, Jekson initiated this action by filing a verified Complaint (ECF No. 3) in Franklin County Superior Court, stating various causes of action against White.

16.    This case was designated as a mandatory complex business case on 22 July 2025 and assigned to the undersigned. (ECF Nos. 1–2.)

17.    On 12 September 2025, White filed his Answer and Counterclaims ("Counterclaims"). The Counterclaims assert claims for (1) breach of contract, (2) quantum meruit, (3) constructive fraud, (4) fraudulent inducement, (5) unfair or

deceptive trade practices ("UDTP"), (6) punitive damages, (7) misappropriation of likeness, and (8) identity theft. (Countercls. ¶¶ 142–252.)

18. Jekson filed the present Motion to Dismiss on 12 November 2025, and a hearing was held on 28 January 2026 at which all parties were represented by counsel.

19. The Motion has been fully briefed and is now ripe for resolution.

**LEGAL STANDARD**

20. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the counterclaims in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the [counterclaims] . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pled factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. HHS, Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (cleaned up).

21. Our Supreme Court has stated "that dismissal pursuant to Rule 12(b)(6) is proper when (1) the [counterclaim] on its face reveals that no law supports the [counterclaim]; (2) the [counterclaim] on its face reveals the absence of facts sufficient to make a good claim; or (3) the [counterclaim] discloses some fact that necessarily

defeats the . . . claim." *Corwin v. Brit. Am. Tobacco PLC,* 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

22. Initially, the Court must address two threshold issues.

23. First, Jekson requests that White's brief in opposition to its Motion to Dismiss be stricken as untimely.

24. Pursuant to Business Court Rule ("BCR") 7.6, White's deadline to respond to the Motion to Dismiss was 2 December 2025, but his brief in opposition to the Motion to Dismiss was not filed until the following day. (Def.'s Br. Opp. Mot. Dismiss, ECF No. 38.)

25. On 12 December 2025, White retroactively filed a motion ("Motion to Extend" ECF No. 43) in which he sought to extend his deadline for responding to Jekson's Motion to Dismiss by one day. Jekson opposes the Motion to Extend. (ECF No. 46.)

26. In the exercise of the Court's discretion, White's Motion to Extend is **GRANTED**, and the Court will consider his response brief.

27. Second, the Court must address which of the documents relied upon by White in opposing the Motion to Dismiss it is permitted to consider without converting Jekson's Motion into a motion for summary judgment.

28. In addressing a Rule 12(b)(6) motion, a court may consider any documents "attached, specifically referred to, or incorporated by reference in the [counterclaim]" without converting the Rule 12(b)(6) motion into a motion for summary judgment.

*Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (cleaned up). Moreover, the Court "may properly consider documents which are the subject of a [counterclaim] and to which the [counterclaim] specifically refers even though they are presented by the [opposing party]." *Oberlin Cap., L.P., v. Slavin,* 147 N.C. App. 52, 60 (2001) (cleaned up).

29. However, consideration of any other types of documents on a Rule 12(b)(6) motion is improper, as "[p]erhaps the most fundamental concept of motions practice under Rule 12 is that evidence outside the pleadings cannot be considered in determining whether the complaint states a claim on which relief can be granted." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *10 (N.C. Super. Ct. June 19, 2019) (cleaned up).

30. Here, White has attached five documents to his response brief. The attached documents are (1) Exhibit A (ECF No. 38.1)—a printout of an email dated 19 February 2020 from Craig Bollinger to White, with the subject line reading "Fw: Employment Agreement;" (2) Exhibit B (ECF No. 38.2)—a copy of a Jekson USA Employment Agreement dated 20 September 2024 (signed by Richard J. Bollinger on behalf of Jekson with no signature in the signature block for White); (3) Exhibit C (ECF No. 38.3)—a copy of a letter dated 1 September 2020 between Shah and Rick Bollinger; (4) Exhibit D (ECF No. 38.4)—a printout of an email dated 18 January 2021 from White to Chad Tyler with the subject line, "RE: Jekson Pay Deferral;" and (5) Exhibit E (ECF No. 38.5)—a printout from the North Carolina Secretary of State's website showing registration information for Jekson.

31.     None of these documents were attached to White's Counterclaims. Moreover, Exhibits A, C, and D are not specifically referenced therein. As a result, they cannot be considered by the Court under the Rule 12(b)(6) standard.

32.     Exhibit B, however, appears to be the proposed employment agreement expressly mentioned in paragraph 93 of the Counterclaims that Jekson asked White to sign in September 2024. Accordingly, the Court is permitted to consider that document in connection with the present Motion.

33.     Finally, Exhibit E can also be considered by the Court because Jekson's registration information filed with the North Carolina Secretary of State is discussed in paragraph 228 of the Counterclaims. Moreover, the Court may take judicial notice of a public agency's website. *See Truist Fin. Corp. v. Rocco*, 2024 NCBC LEXIS 62, at *37 n.62 (N.C. Super Ct. Apr. 5, 2024) ("Our courts routinely take judicial notice of public filings available on governmental agencies' official websites."). Therefore, the Court will not consider Exhibits A, C, and D, but will consider Exhibits B and E.

34.     Having dealt with those threshold issues, the Court now turns to Jekson's arguments as to why each of White's counterclaims should be dismissed.

## I.     Breach of Contract

35.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Davis v. Woods*, 286 N.C. App. 547, 561 (2022) (cleaned up).

36.     White contends that before he started work at Jekson, he entered into a verbal agreement to work for Jekson and that this agreement was "an unwritten employment contract." (Countercls. ¶ 143.) White asserts that the specific terms of that agreement included the following:

> White agreed to work for Jekson as Director of Mechanical Engineering and Plant Manager in exchange for a $150,000 base salary, a $400 monthly car stipend, a $1,200 yearly car maintenance stipend, health insurance coverage for his entire family, and reimbursement for the use of his personal cell phone.

(Countercls. ¶ 144.)

37.     In his Counterclaims, White alleges that during his employment, Jekson failed to pay him the agreed-upon compensation or to provide the benefits Jekson had promised to pay him in the oral employment contract.

38.     Although the parties' respective positions differ significantly on the source and nature of any contractual relationship existing between Jekson and White, the Court need not wade into that dispute at the pleadings stage. For present purposes, it suffices to say that White has pled the necessary elements of a breach of contract claim. Presumably, discovery in this case will clarify the existing dispute between the parties as to whether a binding contract was in effect, whether it was oral or written, and what its terms were.

39.     Accordingly, Jekson's Motion to Dismiss White's breach of contract counterclaim is **DENIED**.

## II.     Quantum Meruit

40.     White has also asserted a counterclaim for quantum meruit.

41.     "To recover in quantum meruit, [the claimant] must show: (1) that [ ]he rendered services to [the opposing party]; (2) that [the opposing party] knowingly and voluntarily accepted the services; and (3) that [the claimant] did not gratuitously give the services." *Rabinowitz v. Suvillaga*, 2019 NCBC LEXIS 8, at *26 (N.C. Super. Ct. Jan. 28, 2019) (cleaned up).

42.     "In addition, quantum meruit claims require a showing that both parties understood that services were rendered with the expectation of payment." *Wing v. Town of Landis*, 165 N.C. App. 691, 693 (2004) (cleaned up). *See Twiford v. Waterfield*, 240 N.C. 582, 585 (1954) ("The quantum meruit must rest upon an implied contract. It must be made to appear that at the time the services were rendered, payment was intended on the one hand and expected on the other.") (cleaned up).

43.     However, where an express contract exists covering the same subject matter, a claim for quantum meruit must fail. *See, e.g.*, *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713 (1962) ("[A]n express contract precludes an implied contract with reference to the same matter.").

44.     Jekson argues that no claim for quantum meruit can exist where the parties' relationship is governed by contract. This is true, Jekson contends, whether the Court ultimately finds White's employment relationship with Jekson to be governed by an oral contract (as White contends) or by a written contract (as Jekson asserts).

45. Under North Carolina case law, a party is permitted to plead in the alternative both a claim for breach of contract and a quantum meruit claim. *See Rossabi Reardon Klein Spivey, PLLC v. Greater Greensboro Entm't Grp., LLC* 2020 NCBC LEXIS 62, at *18 (N.C. Super. Ct. May 8, 2020) ("Notwithstanding that an express contract precludes an implied contract concerning the same matter, it is also well established under North Carolina law that a party may plead claims in the alternative.") (cleaned up); *Bandy v. Gibson*, 2017 NCBC LEXIS 66, at *11 (N.C. Super. Ct. July 26, 2017) ("It is well-established that liberal pleading rules permit pleading in the alternative, and that breach of express contract and quantum merit theories may be pursued in the complaint even if plaintiff may not ultimately be able to prevail on both." (cleaned up)).

46. Therefore, out of an abundance of caution, Jekson's Motion to Dismiss is **DENIED** as to White's quantum meruit claim without prejudice to Jekson's right to reassert this argument at a later stage of this litigation.

### III. Constructive Fraud

47. Jekson also seeks dismissal of White's counterclaim for constructive fraud. In this claim, White asserts, *inter alia*, that Jekson deceived him into believing it would deliver on its representations to him about his compensation.

48. Our Supreme Court has recognized that the elements of a constructive fraud claim largely overlap with the elements of a claim for breach of fiduciary duty. *See Chisum v. Campagna*, 376 N.C. 680, 706–07 (2021). "[A] successful claim for constructive fraud [requires] (1) a relationship of trust and confidence, (2) that the

defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *White v. Consol. Planning Inc.*, 166 N.C. App. 283, 294 (2004) (cleaned up). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." *Id.*

49. Our Supreme Court has held that when pleading such a claim a party must allege "facts and circumstances (1) which created the relation of trust and confidence, and (2) which led up to and surrounded the consummation of the transaction in which [the defendant] is alleged to have taken advantage of his position of trust to the hurt of [the claimant]." *Terry v. Terry*, 302 N.C. 77, 85 (1981) (cleaned up).

50. Our Supreme Court has held that a fiduciary relationship rarely exists in the employment context. *See Dalton v. Camp*, 353 N.C. 647, 652 (2001) (finding that a fiduciary relationship in the employment context is rare and requires a showing of "improper influences or domination" between employer and employee); *see also Higgins v. Synergy Coverage Sols., LLC*, 2020 NCBC LEXIS 6, at \*69 (N.C. Super Ct. Jan. 15, 2020) ("North Carolina law is clear, however, that the relationship of an employer or its supervisor to an employee is not confidential and, without more, does not give rise to a fiduciary duty.").

51. White has failed to make any persuasive argument that his allegations give rise to an exception to this general rule. Therefore, Jekson's Motion to Dismiss is

**GRANTED** as to White's constructive fraud claim, and this claim is **DISMISSED with prejudice**.

## IV.  Fraudulent Inducement

52.  Our Supreme Court has recently observed that the elements of fraud and fraudulent inducement are identical. *Value Health Sols., Inc. v. Pharm. Resch. Assocs., Inc.*, 385 N.C. 250, 264 (2023).

> To state a claim for fraud in the inducement, a claimant must allege: (i) that the defendant made a false representation or concealed a material fact he had a duty to disclose; (ii) that the false representation related to a past or existing fact; (iii) that the defendant made the representation knowing it was false or made it recklessly without knowledge of its truth; (iv) that the defendant made the representation intending to deceive the claimant; (v) that the claimant reasonably relied on the representation and acted upon it; and (vi) the claimant suffered injury.

*Vestlyn BMP, LLC v. Balsam Mt. Grp., LLC*, 2016 NCBC LEXIS 48, at \*17 (N.C. Super. Ct. June 22, 2016) (cleaned up).

53.  In support of his fraudulent inducement claim, White alleges—once again—that Jekson made a number of misrepresentations to him about his compensation.

54.  In response, Jekson makes several arguments as to why this claim should be dismissed, including a contention that White's allegations do not satisfy the heightened pleading requirement for such claims as required by Rule 9(b) of the North Carolina Rules of Civil Procedure.  The Court agrees.

55.  Rule 9(b) requires that "the circumstances constituting fraud" be alleged "with particularity." N.C. R. Civ. P. 9(b).  "The purpose of Rule 9(b) is to provide a defendant with sufficient notice of the fraud alleged in order to meet the charges."

*Provectus Biopharm., Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at \*63 (N.C. Super. Ct. Sept. 28, 2018) (cleaned up). Our Supreme Court has held that "in pleading actual fraud[,] the particularity requirement is met by alleging time, place[,] and content of the fraudulent representation, identity of the person making the representation[,] and what was obtained as a result of the fraudulent acts or representations." *Terry*, 302 N.C. at 85.

56.     Here, the Counterclaims fail to allege misrepresentations by Jekson with sufficient specificity so as to satisfy the heightened pleading requirements of Rule 9(b). As a result, this claim, as currently pled, is legally insufficient.

57.     Accordingly, Jekson's Motion to Dismiss is **GRANTED** as to White's fraudulent inducement claim, and this claim is **DISMISSED without prejudice**.[1]

## V.     UDTP

58.     To establish a prima facie case for UDTP, a plaintiff must show: "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Gen. Fid. Ins. v. WFT, Inc.*, 269 N.C. App. 181, 191 (2020) (cleaned up).

59.     Here, White's UDTP claim is based on his argument that the non-competition provision, non-solicitation provision, and other restrictive covenants contained in the employment agreement Jekson claims was in effect are not enforceable because these provisions were intended to stifle competition and destroy White's subsequent business endeavors.

---

[1] The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Alridge*, 230 N.C. App. 187, 191 (2013).

60. Our Court of Appeals has ruled that disputes between an employer and its employee (including disputes based on an alleged breach of a non-competition agreement) do not typically give rise to UDTP liability. *See Kinesis Advert., Inc. v. Hill,* 187 N.C. App. 1, 21 (2007) (holding that "the employer/employee relationship does not fall within the intended scope and purpose of" a UDTP claim (cleaned up)); *Am. Marble Corp. v. Crawford,* 84 N.C. App. 86, 88 (1987) (holding that the defendant's UDTP counterclaim regarding a non-competition covenant "lies outside the scope of G.S. § 75-1.1").

61. In an attempt to escape the bar of these cases, White argues that Jekson's attempted reliance on the restrictive covenants at issue constitutes a restraint of trade under N.C.G.S. §§ 75-1 and 75-2 for which Jekson can be liable for monetary damages. However, Defendant cites no cases from North Carolina courts to support this proposition.

62. Therefore, Jekson's Motion to Dismiss is **GRANTED** as to Defendant's UDTP claim, and this claim is hereby **DISMISSED without prejudice**.

## VI. Identity Theft

63. White also asserts that Jekson is liable on a theory of identity theft and makes the following allegations in support of this claim:

> Jekson also took out multiple credit cards in Mr. White's name that he did not have access to and proceeded to incur significant balances on them.
>
> Such credit cards affected Mr. White's credit and subjected him to liability on the debt.
>
> . . .

Jekson knowingly obtained and used Mr. White's identifying information to take out credit cards that Mr. White had no access to for use at Jekson.

These credit cards were separate and distinct from the various business credit cards Mr. White used during the course of his employment with Jekson and not disclosed.

Large balances were accrued on such credit cards.

The large balances showed up on Mr. White's credit report and affected his credit.

Such credit cards exposed him to potential liability on the large balances.

Jekson used Mr. White's identifying information to fraudulently represent that it was him, or authorized by him, for the purposes of making credit card transactions in his name to expand the business's access to credit beyond what it would otherwise have access to.

. . .

Jekson used Mr. White's identifying information with the specific intent to obtain credit and make credit transactions.

Mr. White suffered actual damages from Jekson's appropriation of his identifying information in the form of damage to his credit.

(Countercls. ¶¶ 238–39, 243–48, 250–51.)

64. The criminal act of identity theft is set out at N.C.G.S. § 14-113.20, which states as follows:

(a) A person who knowingly obtains, possesses, or uses identifying information of another person, living or dead, with the intent to fraudulently represent that the person is the other person for the purposes of making financial or credit transactions in the other person's name, to obtain anything of value, benefit, or advantage, or for the purpose of avoiding legal consequences is guilty of a felony punishable as provided in G.S. 14-113.22(a).

(b) The term "identifying information" as used in this Article includes the following:

(1)     Social security or employer taxpayer identification numbers.
(2)     Drivers license, State identification card, or passport numbers.
(3)     Checking account numbers.
(4)     Savings account numbers.
(5)     Credit card numbers.
(6)     Debit card numbers.
(7)     Personal identification (PIN) Code as defined in G.S. 14-113.8(6).
(8)     Electronic identification numbers, email names or addresses, internet account numbers, or internet identification names.
(9)     Digital signatures.
(10)    Any other numbers or information that can be used to access a person's financial resources.
(11)    Biometric data.
(12)    Fingerprints.
(13)    Passwords.
(14)    Parent's legal surname prior to marriage.

(c) It shall not be a violation under this Act for a person to do any of the following:

(1)     Lawfully obtain credit information in the course of a bona fide consumer or commercial transaction.
(2)     Lawfully exercise, in good faith, a security interest or right of offset by a creditor or financial institution.
(3)     Lawfully comply, in good faith, with any warrant, court order, levy, garnishment, attachment, or other judicial or administrative order, decree, or directive, when any party is required to do so.

N.C.G.S. § 14-113.20.

65.     The General Assembly has provided that conduct violative of N.C.G.S. § 14-113.20 can also give rise to civil liability for monetary damages.  *See* N.C.G.S. § 14-113.22(b); N.C.G.S. § 1-539.2C.

66. Our Supreme Court has stated that identity theft occurs when a person "knowingly obtains, possesses, or uses identifying information of another person, living or dead, with the intent to *fraudulently* represent that the person is the other person for the purposes of making financial or credit transactions in the other person's name." *State v. Jones*, 367 N.C. 299, 302 (2014) (emphasis added and cleaned up).

67. Therefore, because identity theft is grounded in fraud, it is subject to the requirements of Rule 9(b). *See Value Health Sols., Inc.*, 385 N.C. at 266 (noting "the extension of Rule 9(b) to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud" (cleaned up)).

68. Allegations that Jekson fraudulently used White's identity to obtain a credit card without his knowledge or permission *could* potentially state a valid claim for identity theft. But White will need to provide more specificity to these assertions in order to satisfy Rule 9(b).

69. Accordingly, Jekson's Motion to Dismiss is **GRANTED** as to White's identity theft claim, and this claim is **DISMISSED without prejudice**.

## VII.    Misappropriation of Name or Likeness

70. To plead a prima facie claim of misappropriation of name or likeness, a plaintiff must allege: (1) an unauthorized use of plaintiff's name or likeness by defendant (2) "in connection with an advertisement or other commercial enterprise." *RE Carroll Mgmt. Co. v. Dun & Bradstreet, Inc.*, 706 F.Supp.3d 535, 542 (M.D.N.C.

2023) (quoting *Flake v. Greensboro News Co.*, 212 N.C. 780, 792 (1938)); *see also Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 322 (1984).

71.    White asserts two bases for this claim.

72.    First, White contends that following his resignation, Jekson continued to list his name as an officer of the company on the North Carolina Secretary of State's website. White alleges that as a result he has been contacted by several of Jekson's vendors seeking payment for unpaid invoices.

73.    Pursuant to N.C.G.S. § 55-16-22, corporations are required to file annual reports with the Secretary of State containing certain information, including the listing of its principal officers.  *See* N.C.G.S. § 55-16-22(a3)(4).

74.    Thus, the submission of this information by Jekson is more properly characterized as a regulatory requirement than as an act in furtherance of an advertisement or commercial enterprise.  As a result, White's first basis for this claim is insufficient.

75.    Second, White reasserts the above-referenced contention that Jekson acquired one or more credit cards in his name without his knowledge or permission.

76.     Unlike a claim for identity theft, claims for misappropriation of name or likeness do not appear to be subject to a heightened pleading standard under North Carolina law.

77.    Taken in the light most favorable to White, he has alleged that Jekson used his name without his prior permission or knowledge to obtain the financial benefit

associated with obtaining credit for use in the operation of its business—a commercial enterprise.

78.     Although White will need to provide greater specificity with regard to this claim during the course of this litigation, the Court is unable to say that it fails as a matter of law at the pleadings stage.

79.     Therefore, Jekson's Motion to Dismiss White's counterclaim for misappropriation of name or likeness is **GRANTED in part and DENIED in part**.

## VIII.     Punitive Damages

80.     Finally, Jekson seeks dismissal of White's claim for punitive damages on the ground that punitive damages are a *remedy* rather than a *claim*.

81.     North Carolina courts have repeatedly held that "a claim for punitive damages is not a stand-alone claim." *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *146 (N.C. Super. Ct. Dec. 31, 2019) (cleaned up).  Rather, punitive damages are an appropriate remedy "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C.G.S. § 1D-1.

82.     Therefore, to the extent that White intended to assert a standalone claim for punitive damages, Jekson's Motion to Dismiss is **GRANTED** but without prejudice to White's ability to seek punitive damages at a later stage of this litigation as a remedy to the extent he is entitled to do so under applicable North Carolina law.

## CONCLUSION

**THEREFORE**, the Court hereby **ORDERS** as follows:

1.   White's Motion to Extend is **GRANTED**.

2.   Jekson's Motion to Dismiss White's breach of contract claim is **DENIED**.

3.   Jekson's Motion to Dismiss White's claim for quantum meruit is **DENIED**.

4.   Jekson's Motion to Dismiss White's constructive fraud claim is **GRANTED**, and this claim is **DISMISSED with prejudice**.

5.   Jekson's Motion to Dismiss White's fraudulent inducement claim is **GRANTED**, and this claim is **DISMISSED without prejudice**.

6.   Jekson's Motion to Dismiss White's UDTP claim is **GRANTED,** and this claim is **DISMISSED without prejudice**.

7.   Jekson's Motion to Dismiss White's identity theft claim is **GRANTED,** and this claim is **DISMISSED without prejudice**.

8.   Jekson's Motion to Dismiss White's claim for misappropriation of name or likeness is **GRANTED in part** and **DENIED in part**.

9.   Jekson's Motion to Dismiss White's punitive damages claim is **GRANTED**, and this claim is **DISMISSED** without prejudice to White's right to seek the remedy of punitive damages at a later stage of this case to the extent permitted by North Carolina law.

**SO ORDERED**, this the 18th day of March, 2026.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases